[No. S027252. Dec. 30, 1993.]

LAUREL HEIGHTS IMPROVEMENT ASSOCIATION OF SAN FRANCISCO, INC., Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent.

1114

1118

COUNSEL

Kathryn R. Devincenzi for Plaintiff and Appellant.

Joel Reynolds and Nora Chorover as Amici Curiae on behalf of Plaintiff and Appellant.

James E. Holst, John F. Lundberg, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., Ethan P. Schulman, Anna C. Shimko and Anne E. Mudge for Defendant and Respondent.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Craig C. Thompson, Deputy Attorney General, Ronald A. Zumbrun, Robin L. Rivett, James S. Burling, Donald V. Collin, Jo Anne M. Bernhard, McDonough, Holland & Allen and Richard E. Brandt as Amici Curiae on behalf of Defendant and Respondent.

OPINION

PANELLI, J.—

## I. INTRODUCTION

After the passage of almost five years, we are again called upon to evaluate the efforts of the Regents of the University of California (Regents) to comply with the mandates of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) in connection with the proposed relocation within the City of San Francisco of the biomedical research facilities of the School of Pharmacy at the University of California, San Francisco (UCSF). (See *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278] [hereafter *Laurel Heights I*].) We undertake review of this dispute between the Regents and the Laurel Heights Improvement Association of San Francisco, Inc. (Association), a second time in order to address the question of what constitutes "significant new information" in a final environmental impact report (EIR) so as to require its recirculation for public

comment before certification pursuant to Public Resources Code section 21092.1.[1] We also consider the standard of review to be applied to the decision whether to recirculate.

We conclude that recirculation is only required when the information added to the EIR changes the EIR in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible project alternative or mitigation measure that would clearly reduce such an effect and that the project's proponents have declined to implement. We further conclude that a decision not to recirculate an EIR must be supported by substantial evidence. Finally, we conclude that substantial evidence supports the Regents' decision in this case not to recirculate the final EIR; therefore, the judgment of the Court of Appeal is reversed.

## II. BACKGROUND

### A. A Project Mired in Controversy

The early history of the dispute between the Regents and the Association is set forth in detail in *Laurel Heights I*, *supra*, 47 Cal.3d at pages 388-390. A brief reprise of these facts as well as what has occurred since that case was decided is essential to understanding this continuing controversy.

"The UCSF Parnassus campus in San Francisco is the site of the University's Schools of Medicine, Nursing, Pharmacy, and Dentistry. In 1982, the University of California (University) prepared a long range development plan for UCSF, which indicated there were serious space constraints at the Parnassus campus and concluded there was a need to develop off-campus locations for academic and support activities.

"To alleviate these space constraints, in February 1985 the Regents . . . purchased the Presidio Corporate Center, formerly known as the Fireman's Fund Insurance Building, located in the Laurel Heights neighborhood of San Francisco, approximately two miles northeast of the Parnassus campus. The Laurel Heights neighborhood is a mixture of residential and commercial development. The facility purchased by the Regents is a 10-acre site containing a 354,000 square-foot building (exclusive of parking area) and a 13,000 square-foot annex." (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 388.) The Regents decided to relocate the School of Pharmacy biomedical research units to the Laurel Heights facilities.

---

[1]All further statutory references are to the Public Resources Code unless otherwise indicated.

After the relocation decision was made, UCSF began the CEQA review process. A draft EIR was prepared and circulated. During the period for public review and comment on the EIR, it became evident that the proposed relocation was the subject of intense controversy. Neighborhood opinion coalesced around the question of whether "scientific research using toxic chemicals, carcinogens, and radioactive materials is too high-risk to be conducted in a residential neighborhood. [After a public comment period,] the Regents held a public meeting to respond to comments received during the review period. UCSF proposed measures to mitigate the identified environmental effects and prepared a final EIR, concluding that the environmental effects had been 'reduced to a level of insignificance.' The Regents certified the final EIR." (*Laurel Heights I, supra*, 47 Cal.3d at p. 389.)

The Association challenged the final 1986 EIR on grounds it failed to comply with CEQA. The trial court upheld the Regents' certification. In 1987, the Court of Appeal reversed on three primary grounds: insufficient description of the project, inadequate discussion of feasible alternatives to the project, and a lack of showing that significant environmental effects would be mitigated. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 389-390.)

We granted review. In December of 1988, we affirmed the decision of the Court of Appeal on the first two grounds, but reversed on the third. After discussing the mitigation measures in the final 1986 EIR at some length, we held that there was substantial evidence in the record to support the Regents' finding that any significant adverse effects of the project would be mitigated. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 407-422.) Because of deficiencies in the project description and the discussion of alternatives, however, we directed the Regents to prepare and certify an adequate EIR. We stated that, with respect to mitigation measures, the new EIR was required to discuss only those mitigation measures necessary for new or more significant adverse environmental effects not discussed in the final 1986 EIR. (*Id.* at p. 422.) We also specified that the Regents were not to expand or add additional operations at the Laurel Heights facilities until a "proper" EIR was certified. (*Id.* at p. 428.)

In the wake of our decision, the Regents produced a completely new and more thorough draft EIR. After the draft EIR was published in October 1989, UCSF solicited public comment over a sixty-day period, sponsored two informational meetings, held a public hearing over three successive evenings, evaluated the comments, and prepared detailed responses to the comments.

UCSF received voluminous written comments on the draft EIR. According to the Regents and undisputed by the Association, the Association alone

submitted letters containing over 50 pages of comments on over 150 separate topics or issues and included in its written comments 2 boxes of unindexed documents containing nearly 5,000 pages of exhibits.

In April 1990, the final EIR was published. The final EIR consists of six volumes containing more than two thousand pages analyzing the environmental consequences of the proposed relocation.[2] The final EIR contains information that was not present in the draft EIR. According to the Association, the new information includes three new noise studies, two new studies relating to potential toxic discharges, a clarification that one loading dock, rather than three, will be used for shipping and receiving, the recognition that "night lighting glare" could result from the use of the laboratories in the evening and early morning, and an expanded analysis of the alternative of expansion at the Parnassus campus. The final EIR was not recirculated for public comment, although the Association and others requested orally and in writing that it be recirculated. On May 18, 1990, the Regents certified the final EIR, adopted findings required in connection with the certification, as well as a mitigation monitoring program, and approved the Laurel Heights project.

The Association filed a writ of mandate challenging the validity of the final EIR on numerous grounds and requesting vacation of the Regents' certification. The trial court denied the petition. The Association appealed.

Finding it necessary to reach only one of the Association's numerous contentions, the Court of Appeal reversed. It held that the final EIR contained "significant new information," which, under section 21092.1, required that the final EIR be recirculated for additional public comment prior to certification.

We granted review to consider the issue addressed by the Court of Appeal.[3]

B. *The CEQA Review Process*

The dispute over the proper interpretation of section 21092.1 cannot be resolved without an understanding of both the purposes and framework of the CEQA review process.

---

[2]The 1986 final EIR consisted of two volumes containing approximately five hundred pages.

[3]In its answer to the Regents' petition for review, the Association raised 16 additional issues for review that were not resolved by the Court of Appeal. The parties agree that, if we determine that recirculation of the final EIR was not required under section 21092.1, the case should be remanded to the Court of Appeal for resolution of these issues.

 We have repeatedly recognized that the EIR is the "heart of CEQA." (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] [hereafter *Goleta Valley II*]; *Laurel Heights I, supra*, 47 Cal.3d at p. 392; see also Guidelines, § 15003, subd. (a).[4]) "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' (*Laurel Heights [I], supra*, 47 Cal.3d at p. 392.)" (*Goleta Valley II, supra*, 52 Cal.3d at p. 564.) To this end, public participation is an "essential part of the CEQA process." (Guidelines, § 15201; see also *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 936 [231 Cal.Rptr. 748, 727 P.2d 1029].)

With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project "may have a significant effect on the environment." (§§ 21100, 21151, 21080, 21082.2 [fair argument standard]; Guidelines, §§ 15002, subd. (f)(1), (2), 15063; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66] [fair argument standard of review].) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068; see also Guidelines, § 15382.)

When an EIR is required, the lead agency initially prepares a draft EIR. Once the draft EIR is completed, a comment period is provided for the public and interested agencies. (§§ 21091, 21092.2, 21104, 21153; Guidelines, §§ 15085, 15086, 15087.) Public hearings to discuss the draft EIR are encouraged, but not required. (Guidelines, § 15087, subd. (g).)[5] The comment period is generally no shorter than 30 days and no longer than 90 days. (§ 21091, subd. (a); Guidelines, § 15087, subd. (c).)

---

[4]All references to "Guidelines" are to the state CEQA Guidelines, which implement CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) This court has yet to decide whether the Guidelines are regulatory mandates or merely aids to interpretation. We need not decide this issue in this case. We, however, have recognized that, "[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights I, supra*, 47 Cal.3d at p. 391, fn. 2; accord, *Goleta Valley II, supra*, 52 Cal.3d at p. 564, fn. 3.)

[5]The Association requests that we take judicial notice of two university publications: the September 1989 and May 1991 versions of the Procedural Handbook and Model Approach for Implementing the California Environmental Quality Act (CEQA). We possess discretionary authority to judicially notice these documents pursuant to Evidence Code section 452, subdivision (c). Because it was in force during the relevant time period, we take judicial notice of the September 1989 version of the document. Because the May 1991 version was

In the course of preparing a final EIR, the lead agency must evaluate and respond to comments relating to significant environmental issues. (§ 21092.5, subd. (a); Guidelines, §§ 15088, 15132, subds. (b - d).) In particular, the lead agency must explain in detail its reasons for rejecting suggestions and proceeding with the project despite its environmental effects. (Guidelines, § 15088, subd. (b).) "There must be good faith, reasoned analysis in response [to the comments received]. Conclusory statements unsupported by factual information will not suffice." (*Ibid.*) Thus, it is plain that the final EIR will almost always contain information not included in the draft EIR.

The final substantive step in the EIR review process is certification of the final EIR. The lead agency is required to certify that the final EIR has been completed in compliance with CEQA, and that it reviewed and considered the information in the final EIR prior to approving the project. (Guidelines, § 15090.) CEQA also requires that, before approving a project, the lead agency "find either that the project's significant environmental effects identified in the [final] EIR have been avoided or mitigated or that the unmitigated effects are outweighed by the project's benefits. (§§ 21002, 21002.1 and 21081; Guidelines, §§ 15091-15093.)" (*Laurel Heights I, supra,* 47 Cal.3d at p. 391.)

If the lead agency adds "significant new information" to the EIR subsequent to the close of the public comment period but *prior* to certification of

---

not published until after the relevant time period, we decline to exercise our authority to take judicial notice of that document.

According to the September 1989 version of the Procedural Handbook and Model Approach for Implementing the California Environmental Quality Act (CEQA) (Handbook), the university requires that a public hearing be held during the EIR review process. (Handbook, *supra,* at p. 2-35.) The purpose of this hearing is to provide a "forum for recording public comments and receiving testimony on the project and the Draft EIR." (*Ibid.*)

The Association also requests that we take judicial notice of the amicus curiae brief filed by the Attorney General of the State of California in *Laurel Heights I.* We decline to do so. (Evid. Code, § 452, subd. (d) [discretion to judicially notice the records of any court in the state].) The Attorney General filed an amicus curiae brief in the present case. There is no need to consult the brief filed in the prior case, which addressed different issues.

The Regents request that we take judicial notice of the trial court opinion in case No. 862850 and the unpublished Court of Appeal opinion in case No. A052850 affirming the trial court's decision. The decisions are of limited relevance to the issues we are reviewing and, therefore, we decline to take judicial notice of them. (Evid. Code, § 452, subd. (d).) We also note that the unpublished Court of Appeal decision does not appear to come within any of the exceptions to the rule against citation of unpublished decisions. (Cal. Rules of Court, rule 977.)

the final EIR, CEQA requires that the lead agency provide a new public comment period. (§ 21092.1.)[6]

The statutory scheme also provides for an additional public comment period *after* the certification of a final EIR if: (1) "substantial changes in the project" are made; (2) "substantial changes" occur regarding the circumstances under which the project is being undertaken; or (3) "new information, which was not known and could not have been known," when the EIR was certified, becomes available. (§ 21166;[7] see also Guidelines, §§ 15162, 15163.) The Guidelines in turn generally define "new information" as information which shows that the project will have new or more severe "significant effects" on the environment not disclosed in the prior EIR. (Guidelines, § 15162, subd. (a.).)[8] A "significant effect" is further defined in

---

[6]Section 21092.1 states in full: "When significant new information is added to an environmental impact report after notice has been given pursuant to Section 21092 and consultation has occurred pursuant to Sections 21104 [with certain state agencies] and 21153 [with certain public and local agencies], but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the environmental impact report."

[7]Section 21166 states in full:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

[8]Guidelines section 15162, subdivision (a) states in full:

"(a) Where an EIR or negative declaration has been prepared, no additional EIR need be prepared unless:

"(1) Subsequent changes are proposed in the project which will require important revisions of the previous EIR or negative declaration due to the involvement of new significant environmental impacts not considered in a previous EIR or negative declaration on the project;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken, such as substantial deterioration in the air quality where the project will be located, which will require important revisions in the previous EIR or negative declaration due to the involvement of new significant environmental impacts not covered in a previous EIR or negative declaration; or

"(3) New information of substantial importance to the project becomes available, and

"(A) The information was not known and could not have been known at the time the previous EIR was certified as complete or the negative declaration was adopted, and

"(B) The new information shows any of the following:

"1. The project will have one or more significant effects not discussed previously in the EIR;

the Guidelines as a "substantial, or potentially substantial, adverse change." (Guidelines, § 15382.)[9]

With this statutory framework in mind, we address the issues before us.

## III. DISCUSSION

### A. When Does Section 21092.1 Require Recirculation?

The key to whether the Regents were required to recirculate the final EIR in this case is the meaning of the statutory phrase "significant new information." Neither statutes nor the Guidelines define this phrase.[10] The Regents argue that the Legislature did not intend to require recirculation of a final EIR prior to certification except on the grounds found in the previously enacted standards for preparation of subsequent and supplemental EIR's after certification which were set forth in section 21166 and the guidelines implementing that statute. According to the Regents, "significant new information" therefore must mean new information that shows that the project will have new or more severe adverse effects on the environment not previously disclosed in the EIR. On the other hand, the Association argues that the phrase "significant new information" is derived directly from *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813 [176 Cal.Rptr. 342] (hereafter *Sutter*). The Association further contends that the statutory language imposes a duty to recirculate whenever *any* new, arguably significant information or data, is added to the final EIR, regardless of whether the information reveals environmental bad news. Various amici

"2. Significant effects previously examined will be substantially more severe than shown in the EIR;

"3. Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project; or

"4. Mitigation measures or alternatives which were not previously considered in the EIR would substantially lessen one or more significant effects on the environment."

[9]Guidelines section 15382 reads in full: " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historical or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant."

[10]The Association brought to our attention proposed draft amendments to the Guidelines clarifying, among other areas, the standards for recirculation of EIR's pursuant to section 21092.1. We do not rely upon these proposed amendments as authority in our analysis. The amendments remain in draft form and have not been adopted. Moreover, changes to the Guidelines act prospectively only. (Guidelines, § 15007, subd. (b); *Lewis* v. *Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823, 829, fn. 6 [211 Cal.Rptr. 884].)

curiae have advanced other interpretations of the phrase. For reasons explained below, our interpretation of the statutory language is generally in accord with the Regents' position.

As we have often noted, our role in interpreting or construing a statute is to ascertain and effectuate the legislative intent. (E.g., *City of San Jose* v. *Superior Court* (1993) 5 Cal.4th 47, 54 [19 Cal.Rptr.2d 73, 850 P.2d 621].) When appropriate, we look to legislative history as an extrinsic aid in order to assist us in our task. (*Ibid.*)[11]

The statutory language in question was enacted in 1984 as part of a larger measure amending CEQA. (Assem. Bill No. 2583 (1983-1984 Reg. Sess.) § 7, enacted as Stats. 1984, ch. 1514, § 7, p. 5340.) The bill was the result of a study for improving CEQA that was conducted by the Committee on the Environment of the State Bar of California at the request of the Assembly Committee on Natural Resources. The State Bar committee's December 1983 report suggested, among other measures, that the Legislature specify the circumstances under which a public agency is required to recirculate an environmental impact report. (The Cal. Environmental Quality Act: Recommendations for Legis. and Admin. Change, A Rep. to the Assem. on Natural Resources by the Com. on the Environment of the State Bar of Cal. (Dec. 1983) at p. 26 [hereafter State Bar Report].) To clarify this issue, the State Bar committee recommended that the Legislature codify *Sutter, supra,* 122 Cal.App.3d 813. (State Bar Rep., *supra,* at p. 28.) The committee stated that *Sutter* correctly summarized the law and enunciated standards that are usable in determining whether an EIR should be recirculated. (*Ibid.*)

In *Sutter*, a county board of supervisors prepared an EIR for a tomato paste processing plant. At a public hearing the final EIR was criticized for several deficiencies and two board members expressed the opinion that the final EIR was " 'inadequate' " and "could not survive judicial review." (*Sutter, supra,* 122 Cal.App.3d at p. 821.) As a result, the board directed its staff to rewrite the final EIR. The revised final EIR "fundamentally" reorganized the previous information and provided a substantial amount of new information, including additional details about the potential effects of the

---

[11]The Regents and the Association request that we take judicial notice of numerous documents comprising the legislative history of Assembly Bill No. 2583, which enacted section 21092.1. We grant the requests and have reviewed all of the documents submitted.

plant on the environment and substituting some new data for information which had been repudiated by its purported author.[12]

The *Sutter* court observed that neither the statute nor the Guidelines addressed the question of what procedures should be followed when new information is added to an EIR between the close of the public comment period and certification. The *Sutter* court looked for guidance to the state law governing the requirements for subsequent and supplemental EIR's as found in section 21166 and its implementing regulations, and to federal cases applying the National Environmental Protection Act (NEPA), which provides that supplements to environmental impact statements (the federal equivalent of EIR's) must be circulated.[13] (*Sutter, supra*, 122 Cal.App.3d at pp. 821-823.)

Reasoning by analogy, the *Sutter* court determined that recirculation for public comment would be an appropriate procedure to follow in the situation where "significant new information" is added to an EIR after the close of the public comment period, but *prior* to certification. (*Sutter, supra*, 122 Cal.App.3d at pp. 818, 822-823.) The *Sutter* court further explained that recirculation should not be required where the new information added to the EIR "merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR . . . ." (*Id.* at pp. 822-823.) On the other hand, where " 'substantial changes' in the EIR are made, recirculation is required. [Citation.]" (*Id.* at p. 823.)

By adopting this standard, the *Sutter* court explicitly rejected the proposition that the addition of *any* new information triggers recirculation. A contrary conclusion indeed would have been at odds with the statutory scheme, which did not (and does not) generally require that a final EIR be recirculated even though that document by definition contains information

---

[12]"Among the new information included therein were additional details regarding the quantities of pesticide residues to be expected in the tomato waste water, a more elaborate discussion of ground water availability and the projected impact of the plant on the water table, updated figures on the amount of motor vehicle traffic in the vicinity of the plant and a discussion of the effect on rail traffic and new figures on the proposed method of disposing of waste water, substituting Department of Water Resources estimates of evapo-transpiration potentials of pasture land in the Sacramento Valley during the tomato processing season for figures used in the previous EIR which were repudiated by their purported author." (*Id.* at pp. 817-818.)

[13]Under federal law, a supplement may be prepared to either a draft or a final environmental impact statement. The standards governing the preparation and procedures for such supplements are the same regardless of whether the environmental impact statement is in draft or final form. (40 C.F.R. § 1502.9(c) (1992).) Federal law also provides that "[i]f a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion." (40 C.F.R. § 1502.9(a) (1992).)

not found in the draft EIR in the form of public comments and responses thereto.[14]

In determining when recirculation prior to certification should be required, the *Sutter* court used CEQA terms with specific meanings. As previously mentioned, the *Sutter* court looked for guidance to section 21166 and its implementing guidelines. Section 21166 governs the analogous situation of preparation of a subsequent or supplemental EIR after a final EIR is certified. The terms "significant," "new information," and "substantial change" are all found in section 21166 or its implementing guidelines. For these reasons, we believe it is appropriate to look to these sources for guidance in interpreting section 21092.1.

The reasons that public comment in the CEQA review process is initially solicited also help guide us in our interpretation of section 21092.1. The primary reason for soliciting comments from interested parties is to allow the lead agency to identify, at the earliest possible time, the potential significant adverse effects of the project and alternatives and mitigation measures that would substantially reduce these effects. (§ 21003.1, subds. (a) & (b).)

▪ With these sources of guidance in mind, we conclude that the addition of new information to an EIR after the close of the public comment period is not "significant" unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement. (Cf. Cal. Pub. Resources Agency, Dig. of Assem. Bill No. 2583 (1983-1984 Reg. Sess.) at p. 7 [stating that *Sutter* and the bill recognize "the importance of notifying the public of changes to an environmental document which deals with significant new information on significant effects which has not been previously reviewed by the public"].) ▪ As recognized by the *Sutter* court, recirculation is not required where the new information added to the EIR "merely

---

[14]Unlike a final EIR, a federal final environmental impact statement must be circulated for public review at least 30 days prior to project approval. (40 C.F.R. §§ 1502.19, 1506.10(b)(2) (1992).) "In this regard, the CEQA process is deliberately made shorter than federal process under [NEPA]." (Discussion foll. Guidelines, § 15089.) Because of this difference in the state and federal statutory schemes, federal authority is of limited value in interpreting section 21092.1, except to the extent that it illuminates the holding of *Sutter, supra,* 122 Cal.App.3d 813. (See *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 202 [132 Cal.Rptr. 377, 553 P.2d 537] [NEPA case law did not govern similar question under CEQA where a specific state statute set forth standards different from the federal standards].)

clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR." (*Sutter, supra,* 122 Cal.App.3d at pp. 822-823.) On the other hand, recirculation is required, for example, when the new information added to an EIR discloses: (1) a new substantial environmental impact resulting from the project or from a new mitigation measure proposed to be implemented (cf. Guidelines, § 15162, subd. (a)(1), (3)(B)(1)); (2) a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance (cf. Guidelines, § 15162, subd. (a)(3)(B)(2)); (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents decline to adopt (cf. Guidelines, § 15162, subd. (a)(3)(B)(3), (4)); or (4) that the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless (*Mountain Lion Coalition* v. *Fish & Game Com.* (1989) 214 Cal.App.3d 1043 [263 Cal.Rptr. 104]).[15]

With the addition of the fourth category of "triggering information" to the list, we recognize that "significance" for purposes of section 21092.1 cannot be defined *exclusively* in terms of the grounds for recirculation found in section 21166, from which the first three categories are drawn. The different circumstances governed by these statutes mandate this conclusion.

■ In the case of a certified EIR, which is a prerequisite for application of section 21166, section 21167.2 mandates that the EIR be conclusively presumed valid unless a lawsuit has been timely brought to contest the validity of the EIR. This presumption acts to preclude reopening of the CEQA process even if the initial EIR is discovered to have been fundamentally inaccurate and misleading in the description of a significant effect or the severity of its consequences. After certification, the interests of finality are favored over the policy of encouraging public comment.

■ By way of contrast, section 21092.1 was intended to encourage meaningful public comment. (See State Bar Rep., *supra,* at p. 28.) Therefore, new information that demonstrates that an EIR commented upon by the public was so fundamentally and basically inadequate or conclusory in nature that public comment was in effect meaningless triggers recirculation under section 21092.1. (See, e.g., *Mountain Lion Coalition* v. *Fish & Game Com., supra,* 214 Cal.App.3d 1043.)

---

[15]We acknowledge that this list of examples is generally consistent with proposed Guidelines, section 15088.5, which is presently under consideration by the California Resources Agency.

Contrary to the arguments of the Association, the holding of *Sutter* is consistent with the views we express here. Although the *Sutter* opinion does not clearly explain the extent of the changes made between the draft EIR and the final EIR at issue in that case, it is apparent that the court and the agency viewed the draft EIR as fundamentally and basically inadequate in many respects. (*Sutter, supra,* 122 Cal.App.3d at pp. 821, 823.)

Furthermore, our understanding of the term "significant new information" is reflected explicitly or implicitly in other holdings of our lower courts. For example, in *Marin Mun. Water Dist.* v. *KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1667 [1 Cal.Rptr.2d 767], recirculation was not required when the final EIR contained a revised estimate that the subject water moratorium could last 10 years or more. The draft EIR disclosed that the duration of the proposed moratorium was indefinite and had considered the impacts of a moratorium of at least five to six years in duration. The new information merely served to clarify an environmental effect that was adequately discussed in the draft EIR.

In *Sierra Club* v. *Gilroy City Council* (1990) 222 Cal.App.3d 30 [271 Cal.Rptr. 393], the presence on the project site of the potentially endangered California tiger salamander was discovered after the close of the public comment period for the draft EIR. In response to public comment, however, the lead agency delayed approval of the project and commissioned a study. A "preliminary" final EIR was prepared relying upon the study and was made available for public and agency comment before the project was certified. The new information, the presence of the tiger salamander, demonstrated that the draft EIR had not addressed a potentially substantial adverse environmental effect. Therefore, revision and recirculation were required and were voluntarily undertaken by the agency.

Similarly, a "woefully inadequate" draft EIR was found to have deprived the public of its opportunity to comment upon the resumption of sport hunting of mountain lions. (*Mountain Lion Coalition* v. *Fish & Game Com., supra,* 214 Cal.App.3d at pp. 1050-1051.) In defiance of a previously issued writ, the agency failed to address in other than conclusory fashion many areas relating to the cumulative impacts of the proposed hunting.

Discovery that a project encroached upon wetlands, when the text of the draft EIR indicated that the wetlands area would remain undeveloped, was a substantial change in circumstances requiring revision and recirculation of the EIR. The failure to do so "deprived the public, who relied upon the EIR's representations, of meaningful participation regarding the issue of wetlands

degradation," a significant adverse effect. (*Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 365 [212 Cal.Rptr. 127].)

Finally, the opportunity for additional public comment was also required where an uncirculated EIR disclosed for the first time that, for mitigation purposes, a street would be extended through a ridge line resulting in a previously unidentified adverse visual impact. (*Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986, 998-999 [178 Cal.Rptr. 367].)

■ By codifying the "significant new information" language of *Sutter*, *supra*, 122 Cal.App.3d 813, the Legislature apparently intended to reaffirm the goal of meaningful public participation in the CEQA review process. (State Bar Rep., *supra*, at p. 28.) It is also clear, however, that by doing so the Legislature did not intend to promote endless rounds of revision and recirculation of EIR's. Recirculation was intended to be an exception, rather than the general rule. Significantly, at the time section 21092.1 was enacted, the Legislature had been and was continuing to streamline the CEQA review process.[16] Recognizing the legislative trend, we previously have cautioned: "[R]ules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Goleta Valley II, supra*, 52 Cal.3d at p. 576.) In our interpretation of section 21092.1, we have given consideration to both the legislative goals of furthering public participation in the CEQA process and of not unduly prolonging the process so that the process deters development and advancement.

B. *What Standard of Review Applies to the Decision Whether to Recirculate?*

It remains to be considered whether the trial court erred in not requiring recirculation. In reviewing an agency's determination, finding or decision

---

[16]In 1976, the Legislature enacted legislation to require CEQA review to be integrated with, and run concurrently with, other planning processes (§ 21003), to define the purpose and requirements of an EIR (§§ 21003, 21061), to define critical terms used in CEQA (§§ 21061.1 ["feasible"], 21068 ["significant effect on the environment"]), to require a one-year deadline for compliance with CEQA (§§ 21102.2, 21151.5), and to direct the Office of Planning and Research to prepare and develop guidelines for the orderly evaluation of projects and preparation of EIR's (§ 21083). In 1978, the Legislature enacted the California Permit Streamlining Act, which required that both state and federal agencies establish time limits to require the completion of an EIR within one year (§§ 21100.2, 21151.5), and established various other processing deadlines. In 1984, in the same legislation that enacted section 21092.1, further reforms to the CEQA litigation process were imposed. (§§ 21167.6 [deadline for preparation of administrative records, deadline for preparation of appellate records], 21167.8 [mandatory settlement meetings].)

Recently, the Legislature enacted further measures to streamline the CEQA review process and CEQA litigation. (Stats. 1993, ch. 1130.)

under CEQA, a court must determine whether the agency prejudicially abused its discretion. (§ 21168.5.)[17] "Abuse of discretion is established if the agency has not proceeded in a manner required by law *or* if the determination or decision is not supported by substantial evidence." (*Ibid.,* italics added.) The Guidelines further define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)

 The Regents contend that the substantial evidence standard of review is mandated in this case by these authorities. By contrast, the Association advances several independent arguments, two of which are premised directly upon the language of section 21168.5, for applying a more stringent standard of review. We agree with the Regents that the appropriate standard is the substantial evidence standard.

To counter our determination, the Association contends that, if a procedural violation of CEQA is shown, the substantial evidence prong of the statutory standard of review does not come into play. While the Association's contention may have merit in the abstract, it does not apply to the facts of the present case. The Association first argues that the Regents failed to proceed as required by law, because they did not set forth express findings denying the Association's request that the final EIR be recirculated. We are not persuaded by the Association's claim. CEQA does not require an express order or finding on the subject of whether to recirculate a final EIR. (Cf. *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 81, fn. 12 [finding requirement of written negative declaration implicit in certain statutory and regulatory language].)

Furthermore, we are not faced in this case with an administrative record that is *silent* on the question of whether the recirculation request was considered by the decision maker. (Cf. *City of San Jose* v. *Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1017 [237 Cal.Rptr. 845] [agency did not consider whether change in source of water supply for development triggered the need for a subsequent EIR, a supplemental EIR or an addendum to the original EIR].) The Regents were aware of the requests by the Association and others to recirculate the final EIR. The final EIR contained a response to the request for recirculation. The response stated that, since the

---

[17]The parties agree that the present action is one of traditional mandamus subject to the standard of review set forth in section 21168.5. As we have previously observed, the standard of review is essentially the same whether the action is one of traditional mandamus governed by section 21168.5 or one of administrative mandamus governed by section 21168, i.e., whether substantial evidence supports the agency's determination. (*Laurel Heights I, supra,* 47 Cal.3d at p. 392, fn. 5.)

final EIR "[did] not include significant new information about environmental impacts and did not require a fundamental reorganization of the [draft EIR], there [was] no need to recirculate the [f]inal EIR for an additional public review period."[18] The Regents certified the final EIR. By doing so, the Regents necessarily concluded that the final EIR did not contain significant new information requiring additional public comment. While express findings are preferable for the reason that they make the task of the reviewing court easier, there is no need in this case to remand for the Regents to clarify or expressly state their findings.

The Association also contends that the Regents committed a separate procedural violation of CEQA by failing to recirculate the final EIR. Such an argument begs the question. The Association's position ignores the statutory mandate that only the addition of *significant* new information triggers recirculation. (§ 21092.1.) Barring unusual circumstances not present here, the agency necessarily must decide whether the information meets this statutory requirement.[19] A procedural violation cannot be found in this case unless the Regents' decision regarding the significance of the new information fails to pass muster under the applicable standard of review.

■ The Association next argues that, if the substantial evidence prong of the standard of review is applicable, then in deciding whether to recirculate the final EIR under section 21092.1, the "fair argument" test used to review the decision, pursuant to section 21151, to prepare a negative declaration, rather than an EIR, should apply. However, section 21151 commands that an EIR must be prepared whenever a project "*may* have a significant effect on the environment." (Italics added.) In *No Oil, Inc.* v. *City of Los Angeles*, *supra*, 13 Cal.3d at pages 68, 75, 83-85, we interpreted *section 21151* to require preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental

---

[18]The test applied by the Regents' staff, and presumably by the Regents, is generally in accord with the interpretation of section 21092.1 that we have set forth herein. Because the standard applied was not contrary to law, there was no abuse of discretion on this ground. (Cf. *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at pp. 82-88.)

[19]*Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1019 [192 Cal.Rptr. 325] is inapposite. In that case, the procedural violation was admitted: The agency failed to submit the draft EIR to the state clearinghouse *as required by the Guidelines* before the project was approved.

*Mira Monte Homeowners Assn.* v. *County of Ventura, supra*, 165 Cal.App.3d 357, is distinguishable. In that case the encroachment on wetlands containing rare plant species was admitted and the Guidelines defined destruction of rare plants as significant. (Guidelines, appen. G.) Thus, substantial evidence could not support the agency's decision not to recirculate the final EIR or prepare a subsequent EIR and there was no need to consider the standard of review.

impact. (See also *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514] [applying "fair argument" test to affirm judgment invalidating decision not to prepare an EIR].)[20] Our decision, however, expressly acknowledged that *judicial review* of agency decisions under CEQA is governed by sections 21168 (administrative mandamus) and 21168.5 (traditional mandamus) and, of course, did not purport to alter the standard of review set forth in those statutes. Rather, the "fair argument" test was derived from an interpretation of the language of, and policies underlying, section 21151 itself. For this reason, the "fair argument" test has been applied *only* to the decision whether to prepare an original EIR or a negative declaration. (E.g., *Benton* v. *Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1481-1483 [277 Cal.Rptr. 481] [rejecting use of test to review decision of whether second negative declaration proper for modified project]; *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1071-1072 [230 Cal.Rptr. 413] [rejecting use of test to review decision under section 21166].) The Association has advanced no persuasive authority or reasons for taking this test out of the context of the statutory language of section 21151 and applying it to an agency's decision under section 21092.1.[21]

■ We conclude that the substantial evidence standard set forth in section 21168.5 governs the Regents' decision not to recirculate the EIR in this case.[22] As we observed in *Laurel Heights I*, "[i]n applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.'" (47 Cal.3d at p. 393, quoting *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].) It is this standard of review that we apply to the Regents' determination that the new information in the final EIR was not "significant" pursuant to section 21092.1.

[20]Recently enacted amendments to sections 21080 and 21082.2 clarify that under the fair argument standard, substantial evidence in light of the whole record that a project may have an adverse effect on the environment is required before an EIR, rather than a negative declaration, must be prepared. (§ 21080, as amended by Stats. 1993, ch. 1131, § 5; § 21082.2, as amended by Stats. 1993, ch. 1131, § 7.)

[21]We observe that proposed Guidelines section 15088.5 would adopt the fair argument standard of review for when an EIR must be recirculated pursuant to section 21092.1. We do not agree that this is the appropriate standard.

[22]While we apply the standard of review specified by the Legislature, we note that the analogous federal standard is also a deferential one. The federal Supreme Court has held that the arbitrary and capricious standard of review applies to an agency's decision not to prepare a supplemental environmental impact statement under NEPA. (*Marsh* v. *Oregon Natural Resources Council* (1989) 490 U.S. 360, 376-378 [104 L.Ed.2d 377, 394-395, 109 S.Ct. 1851].)

C. *Does Substantial Evidence Support the Regents' Decision Not to Recirculate the Final EIR?*

The Association contends recirculation of the final EIR was required because the following information added to it was "significant new information" within the meaning of section 21092.1: (1) new noise studies; (2) new studies of potential toxic emissions; (3) clarification of the number of loading docks to be used for certain purposes; (4) recognition of "night lighting glare" as an insignificant impact; and (5) an expanded analysis of the alternative of adding to the existing facilities at the Parnassus campus. After reviewing each of these categories of "new information" in turn, we conclude that substantial evidence supports the Regents' decision not to recirculate the final EIR for public comment.[23]

### 1. *Mechanical Noise Studies*

In analyzing the effects of noise from equipment to be installed at the project, the EIR essentially employed the same methodology that was approved by this court in *Laurel Heights I, supra,* 47 Cal.3d at page 418. The EIR adopts specific performance standards for allowable noise generation. The EIR then represents that the university will implement whatever noise abatement design and equipment modifications are necessary to reduce project noise levels below the performance standards. In certifying the EIR, the Regents adopted this mitigation measure along with procedures to implement and monitor it and found that these actions would reduce the noise impact to a level of insignificance.[24]

The Association nevertheless argues that recirculation was required because, in response to public comment, the final EIR elaborates on the issue of mechanical noise by providing additional noise data.[25] One newly included study supplies additional requested details regarding existing noise levels in the neighborhood of the project. Other newly included information

---

[23]While giving lip service to applying the substantial evidence standard, the concurring and dissenting opinion in effect discards it, fails to give proper weight to the public agency's decision, and proceeds to reweigh the evidence, engaging in rank speculation and failing to "resolve reasonable doubts in favor of the administrative finding and decision." (*Laurel Heights, supra,* 47 Cal.3d at p. 393.) By so doing, the concurring and dissenting opinion abandons the proper role of an appellate court.

[24]The performance standards adopted in the present EIR differ from those adopted in the 1986 EIR and considered in *Laurel Heights I.* Substantial evidence in the record, however, supports the Regents' conclusion that no significant adverse impact on the environment will result if the presently adopted performance standards are met.

[25]The Association also points out that a discrepancy exists between the description of the effluent rates from the exhaust fans found in one of the noise studies and the project plans. The noise study is premised upon a lesser effluent rate. This discrepancy is insignificant in light of the Regents' pledge to mitigate project noise to insignificant levels.

addresses the validity of the representation in the draft EIR that mechanical noise can be mitigated to an insignificant level within the performance standards adopted in the EIR.[26]

Regardless of what conclusions may be appropriately drawn from these studies, we find that substantial evidence supports the Regents' decision that the additional data do not constitute "significant new information." These studies merely serve to amplify, at the public's request, the information found in the draft EIR. The basis of the conclusion in both the draft and final EIR's that mechanical noise effects would be insignificant is the representation that any effects will be mitigated to insignificance by appropriate choices of equipment and installation measures. The new studies do not alter this analysis in any way. Substantial evidence thus supports the Regents' conclusion that additional public comment is not required. (Cf. *Holy Cross Wilderness Fund* v. *Madigan* (10th Cir. 1992) 960 F.2d 1515, 1526-1527 [new report questioning ability to mitigate environmental impact on wetlands did not require supplemental environmental impact statement under NEPA when project permit was expressly conditioned upon no loss of wetlands].)

### 2. *Cumulative Toxic Air Emissions Studies*

In considering the cumulative effect of project toxic emissions together with emissions attributable to other anticipated projects in the Laurel Heights area, the draft EIR states that "there are no accepted methodologies or standards by which to quantitatively measure the cumulative toxic emission impacts of all potential sources of toxic air emissions in the Laurel Heights vicinity . . . ." The draft EIR, therefore, concludes that "the potential cumulative impacts of toxic air emissions are too speculative for evaluation." Such a conclusion is specifically authorized by Guidelines section 15145, which states: "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact."

---

[26]The Association contends that new data added to the appendix of the final EIR demonstrate that nighttime background noise levels will exceed one of the EIR's two voluntary standards of significance, i.e., noise levels will not increase by more than 5 decibels adjusted (dBA) above existing levels. The new data are based upon the "L-90" measurement scale.

The Regents persuasively point out that the 5 dBA standard of significance was adopted and applied in the draft EIR according to the "Ldn" measurement scale. Data in both the draft and final EIR's demonstrate that noise, measured according to that standard, will not increase by more that 0.5 dBA, well within the voluntary standard of significance. Furthermore, the Regents assert that the "L-90" scale of measurement, which is used to measure the very quietest moments, is not appropriately used to determine compliance with the 5 dBA voluntary standard. The conclusions submitted by the Regents' noise expert based upon the data added to the final EIR supports this contention.

The final EIR adopts the same conclusion. Nevertheless, in response to public comments, and "in an effort to provide as much information as possible," the final EIR discusses the health risks from background toxic air contaminant levels and presents two possible approaches to assessing impacts of cumulative toxic air emissions, based upon an experimental study. The study concludes that the "maximum estimated cumulative cancer risk increase would be below the project significance standard," and that "no non-carcinogenic health effects are expected to occur." The final EIR concludes that "due to incomplete data and the lack of accepted means of conducting cumulative toxic air contaminant health risk analysis, for purposes of this EIR the cumulative impact of toxic air emissions is unknown as stated in the DEIR [draft EIR]." The Regents, however, treated the unknown impact for purposes of their required findings "as if it were an unavoidable significant adverse impact" and found that "if the impacts were significant, specific economic, social or other considerations make infeasible project alternatives in the FEIR [final EIR]."

 Substantial evidence again supports the Regents' conclusion that the experimental study does not constitute "significant new information." First, no new adverse environmental impact was shown by the study. To the extent the study can be credited, it reveals comforting news.

Moreover, the studies are experimental; both the draft EIR and final EIR acknowledge that the conclusions are not based upon accepted scientific methodology. The information was merely provided at the request of the public in the interest of amplifying or clarifying the discussion of cumulative toxic air emissions contained in the draft EIR. The minimal value of the experimental study is fully disclosed in the final EIR.

Finally, the Regents did not rely upon the study in deciding whether to approve the project; rather, they conservatively adopted a worst case approach to this unknown impact. Therefore, public comment on this study would not further the purposes of CEQA.[27]

### 3. Description of Use of Loading Docks

The draft EIR considers the environmental impacts of an increased number of truck trips to the project and deems the impacts to be insignificant,

---

[27]For the same reasons, we conclude that the Association's arguments premised upon the failure to aggregate the cumulative impacts in the study with the impacts from boiler emissions and traffic emissions do not further the Association's cause. Regardless of the questionable merits or relevance of aggregating experimental studies with other studies, the analysis in the final EIR and the findings of the Regents would have remained the same. The Regents treated the whole question of cumulative toxic air emissions as an unavoidable significant adverse impact for purposes of making their decision to approve the project.

primarily based on the assessment that most of the trucks would be small trucks and that they would arrive at and depart from the project at fairly even intervals throughout the day. The draft EIR also describes the three existing loading docks at the project and the modifications planned for the Laurel Street dock. In describing these loading docks the draft EIR states: "The University does require trucks over three tons to use the entrance at the intersection of California and Walnut Streets. Trucks weighing less than three tons are required to use the entrance near the intersection of Laurel Street and Euclid Avenue. Commercial trucks over three tons are not allowed on Laurel Street." Thus, it is apparent from the draft EIR that the majority of the trucks will use the Laurel/Euclid entrance.

The final EIR clarifies the uses for each of the loading docks described in the draft EIR as follows: "With project implementation, large trucks (over three tons) would continue to use the California/Walnut entrance to the site, while smaller trucks (less than three tons) would enter from Laurel near Euclid. The loading area noted on pages 118 and 133 of the DEIR, off Presidio Avenue, is currently used, and would continue to be used, only for early morning garbage pick ups. The existing receiving area on the Building's north side just east of the main entrance would no longer be used for deliveries. Under the project, all delivery trucks would be directed to the expanded loading dock on the west [Laurel Street] side of the Building." Thus, the final EIR states that almost all of the truck traffic will be directed to use the expanded Laurel Street loading area.

The Association contends that the change in the description of the use of the loading docks is substantial and requires additional public comment. We conclude that substantial evidence supports the Regents' decision not to seek additional public comment regarding the use of the loading docks.

Contrary to the Association's arguments, we are not confronted with a case where the physical description or scope of the project has changed. (Cf. *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.*, *supra*, 42 Cal.3d 929 [orientation of amphitheater changed after adoption of final EIR]; *City of San Jose* v. *Great Oaks Water Company*, *supra*, 192 Cal.App.3d at pp. 1015, 1017 [drilling of three new wells added to the project after adoption of final EIR].) Rather, in this case, the discussion of the use of the loading docks merely clarifies the existing description of the environmental impacts of the estimated increase in truck traffic by specifically stating that almost all of the trucks will use the expanded Laurel Street loading area. The expansion of this loading area and mitigation measures to

reduce environmental effects from the expansion are fully described in the draft EIR. Moreover, the conclusions regarding the significance of the impacts of this traffic unsurprisingly were not affected. The number of estimated trips for various-sized trucks and the entrances used by the trucks are the same in both the draft and final EIR's. Substantial evidence supports the conclusion that the additional information in the final EIR simply clarifies the original discussion of the effects of increased truck traffic at the project. The clarification does not reveal a new or more severe adverse environmental impact. Recirculation was not required.

### 4. *Discussion of Night-lighting Glare*

The draft EIR does not discuss the potential visual effects of the use of project lights after dark. In response to public comments regarding the hours the lights were expected to be used in the building, the final EIR adds a discussion of the subject. The final EIR concludes that lighting of the project would "add only incrementally to existing night lighting in the project vicinity and is not considered significant." Nevertheless, the final EIR also adopts a mitigation measure to reduce any effects of night lighting even further: design and position interior and exterior light fixtures to minimize light intrusion upon adjacent land uses.

 The Association contends that this newly recognized impact is "potentially significant" and that public comment on mitigation measures should be obtained. We conclude, however, that addition of the discussion of night-lighting glare is an insignificant modification to the EIR that does not disclose a new adverse environmental impact.

Under the circumstances of this case, we do not fault the draft EIR for failing to discuss the potential effect of glare from night lighting at the project. The area in which the project is located is urbanized. A substantial number of street lights surround the project and the adjacent shopping area. Headlights from traffic also diminish the darkness. Moreover, the project building has always been an office building. It is not uncommon for office buildings to be lit in whole or in part after regular business hours. Thus, the Regents could reasonably conclude that any extension in the hours of use of the building would have a de minimis effect on the environment. Based upon the entire record, we conclude that substantial evidence supports a determination that the effect of night lighting would be insignificant. (Guidelines, § 15002, subd. (g) [definition of "effect"].) An insignificant modification to an EIR does not require recirculation for additional public comment.

Although the Association claims that the public should be provided the opportunity to comment upon mitigation measures for the potential glare, mitigation measures are not required where the environmental effect is insignificant. Moreover, it is clear in this case that the mitigation measure adopted by the Regents will not cause additional adverse environmental effects. Further, the Regents did not decline to adopt any suggested mitigation measures. None of the purposes of CEQA will be served by solicitation of further public comment on this subject; only needless delay will result. The decision makers and the public were both adequately informed by the final EIR about the consequences of the project with respect to night-lighting glare.

### 5. *Expanded Discussion of Parnassus Alternative*

The draft EIR devotes over 100 pages to discussion of alternatives to the project. The draft EIR discusses in detail six different uses for the Laurel Heights site and five other locations, some owned by the university and some not, for the research facilities proposed to be located at Laurel Heights. In addition, the draft EIR briefly discusses other alternatives that were considered, but were not addressed in detail, because they were found to be "infeasible, remote or speculative."

Among the alternatives considered, but not addressed in detail, was expansion of the Parnassus Heights campus to accommodate the new research facilities. The draft EIR explains the space deficit at the Parnassus Heights campus and the limitations adopted in the 1976 long-range development plan, at the urging of the state Legislature, on additional development of that campus, which is the most densely developed of all University of California facilities. The draft EIR further explains that, because the necessary space at the Parnassus Heights campus can only be created by demolition of existing buildings fully in use or by violating the limits adopted in the long-range development plan, the alternative of expansion at this site is infeasible.

In response to a single public comment claiming that the alternative of locating the research programs at the Parnassus Heights campus had not been adequately explored in the draft EIR, the final EIR contains a 12-page discussion expanding upon the possible environmental consequences of the alternative. The final EIR concludes that the alternative is infeasible for the reasons stated in the draft EIR. The final EIR also concludes that in no

respect is the Parnassus Heights alternative environmentally superior to the proposed project. ■ The Association nevertheless contends that the expanded discussion of this alternative constitutes "significant new information" triggering recirculation of the EIR. We, however, agree with the Regents that recirculation was not required.

■ An EIR need not consider every conceivable alternative to a project. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 406-407.) Rather, consideration of a reasonable range of feasible alternatives is required to foster informed decisionmaking and public participation. ■ The draft EIR accomplished this goal by considering a wide variety of alternatives ranging from several different uses for the Laurel Heights site to different locations for the research laboratories. The draft EIR also contains succinct statements of the reasons that other alternatives, such as expansion of the Parnassus Heights campus, were deemed not to warrant further discussion. (*Id.* at pp. 404-405.)

Furthermore, the reasons given for the rejection of the Parnassus Heights alternative do not constitute an abuse of discretion and are supported by the record. Since the 1976 long-range development plan embodied a decision that expansion at the Parnassus Heights campus was not desirable and that additional space should be developed in other locations, the Regents did not abuse their discretion by relying upon the policies stated in the long-range development plan to assist them in assessing the feasibility of this alternative. (Cf. *Goleta Valley II, supra*, 52 Cal.3d at pp. 570-573 [county's reliance on its local coastal program in assessing feasibility of alternative sites for EIR permissible].) An alternative is "feasible" and therefore worthy of consideration only if it is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account, economic, environmental, social, and technological factors." (§ 21061.1; see also Guidelines, § 15364.) Substantial evidence supports the conclusion that the Parnassus Heights alternative does not meet this requirement.

The expanded discussion in the final EIR does not change the determination that the expansion of the Parnassus Heights campus is infeasible. Rather it merely amplifies the reasons why the alternative is infeasible and ultimately less desirable. Recirculation is only required when a discussion of a new feasible project alternative, which will not be implemented, is added to the EIR.

## IV. DISPOSITION

For the reasons set forth herein, we reverse the judgment of the Court of Appeal and remand with directions to consider and decide each and every remaining issue raised by the Association on appeal.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., and Baxter, J., concurred.

**GEORGE, J.,** Concurring and Dissenting.—I concur in part III.B. of the majority opinion, which holds that the decision of the Regents of the University of California (hereafter Regents) not to recirculate the final environmental impact report (hereafter EIR) is subject to review under the substantial evidence standard, and in part III.C., subparts 2-5, which hold that substantial evidence supports the Regents' decision not to recirculate the revised EIR on the basis of that document's inclusion of new information regarding the proposed Laurel Heights facility's toxic air emissions, loading docks, night-lighting glare, and project alternatives. (Maj. opn., *ante*, at pp. 1132-1135, 1137-1143.)

I respectfully dissent, however, from part III.A. of the majority opinion, interpreting Public Resources Code section 21092.1,[1] and part III.C., subpart 1, analyzing whether substantial evidence supports the Regents' decision not to recirculate the final EIR on the basis of that document's inclusion of new information describing other attributes of the proposed facility, including its round-the-clock operations and the additional noise that this would generate.

In my view, the majority errs in holding that the addition of "significant new information" to an EIR requires recirculation of an EIR under section 21092.1 only where "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (Maj. opn., *ante*, at p. 1129, original italics.) The majority's specification of a *"substantial* adverse environmental effect" departs from the plain language of section 21092.1, which provides only that the inclusion of "significant new information" in an EIR suffices to require recirculation of that document for public comment. The majority's unduly narrow interpretation is fundamentally at odds with the legislative intent and public policies underlying the California Environmental Quality Act (CEQA) (§ 21000 et seq.) as described in our decisions, cited *post*, next page.

---

[1] All further statutory references are to the Public Resources Code.

Furthermore, although I agree with the majority's conclusion that the new information set forth in the final EIR relating to toxic air emissions, loading docks, night-lighting glare, and project alternatives does not rise to the level of "significant new information" within the meaning of section 21092.1, I agree with the Court of Appeal that the final EIR in other respects *does* contain "significant new information"—insofar as it discloses the Regents' intention to conduct *round-the-clock* operations at the proposed Laurel Heights facility, resulting, among other effects, in an increase in noise. Accordingly, the Regents should have recirculated the final EIR for public comment.

The majority interprets section 21092.1 to refer only to new information that, in the opinion of the lead agency, describes or will produce "substantial adverse environmental effects." Yet, this clearly is not what the statute commands.[2] More accurately, section 21092.1 requires recirculation of an EIR when that document includes new information as to which additional public comment would (1) substantially advance the *core informational purpose* of the document, and (2) assist the lead agency in identifying *potential* significant adverse effects of the project, as well as alternatives and mitigation measures that substantially would reduce these effects. (See *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Laurel Heights Improvement Assn.* v. *Regents of the University of California* (1988) 47 Cal.3d 376, 390-391 [253 Cal.Rptr. 426, 764 P.2d 278] [hereafter, *Laurel Heights I*]; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 79 [118 Cal.Rptr. 34, 529 P.2d 66]; Cal. Code Regs., tit. 14, §§ 15021, 15064, 15121, 15204.) In holding otherwise, the majority departs from the plain meaning of section 21092.1, the public policies underlying CEQA, and this court's own admonition that the Legislature intended CEQA " 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights I, supra,* 47 Cal.3d at p. 390, quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

The majority holds "it is appropriate to look to [section *21166* and its implementing guidelines] for guidance in interpreting section 21092.1." (Maj. opn., *ante,* at p. 1129.) I believe, however, that the majority's reliance

---

[2] Section 21092.1 provides in pertinent part: "When significant new information is added to an [EIR] after notice has been given pursuant to Section 21092 and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again . . . and consult again . . . before certifying the [EIR]."

upon these sources is inappropriate. It is axiomatic that this court's task in interpreting a statute is to ascertain the Legislature's intent, turning first "to the words themselves for the answer," giving effect to statutes "according to the usual, ordinary import of the language employed in framing them." (*Palos Verdes Faculty Assn.* v. *Palos Verdes Pennisula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658 [147 Cal.Rptr. 359, 580 P.2d 1155], internal quotation marks omitted.) The majority ignores these fundamental rules, however, by interpreting section 21092.1 in a manner contrary to the statute's actual language. "[S]ignificant new information," the phrase contained in section 21092.1, and "substantial adverse environmental effects," the interpretation embraced by the majority, constitute distinct standards. The statutory standard of "significant new information" clearly is prospective and explanatory in nature, emphasizing the function of an EIR as an *informational* document prepared for the benefit of a concerned citizenry. (See *Laurel Heights I, supra,* 47 Cal.3d at p. 391 [the purpose of an EIR is to provide public agencies and the public in general with "detailed.information"].) The majority's standard of "substantial adverse environmental effects," in contrast, focuses upon anticipated results, requiring that new information set forth in a revised EIR suggest previously undisclosed and substantial environmental impacts, before recirculation is required. As aptly observed by the Court of Appeal in this case, had the Legislature intended that the standard for recirculation hinge upon an EIR's inclusion of information describing significant new "impacts," it easily could have said so.

In addition to finding unsupportable the majority's statutory analysis, I believe the majority's application of its analysis to the circumstances of the present case is seriously flawed in several respects.

The majority holds it was unnecessary for the Regents to recirculate the final EIR, because that document simply provides "additional noise data[,] . . . studies [that] merely serve to amplify, at the public's request, the information found in the draft EIR." (Maj. opn., *ante,* at pp. 1136-1137.) Yet, as I explain below, the majority's emphasis on the purported insignificance of the additional noise data contained in the final EIR mischaracterizes the fundamental difference between that document and the draft EIR: the draft (nearly 900 pages in length, including appendices) includes only a few vague, inadequate references to the heightened activity anticipated at the proposed Laurel Heights project, yet the final EIR describes a facility, the major components of which would operate on a *round-the-clock basis.* In my view, this difference in the contents of the two documents is statutorily "significant" (§ 21092.1) and thus in itself warrants recirculation of the final EIR for public comment.

The draft EIR in the present case describes a proposed facility that, not unlike typical commercial establishments (such as the insurance offices that previously occupied the site), would operate primarily during normal business hours. The draft EIR further states, rather vaguely, that "[t]he research use would likely result in more evening and weekend activity at the site than at present, although *most occupants would probably leave by about 7 p.m.*" The draft EIR also notes that the facility "would be used more heavily in evening hours and on weekends than at present . . . ." *These two general comments constitute the draft EIR's only references to the round-the-clock activity subsequently described in the revised EIR.*

In contrast, the final EIR indicates that the biomedical research programs (slated to occupy approximately 80 percent of the 352,800-square-foot facility) actually would remain open and operating *throughout the night*, with concomitant increases in noise (from rooftop exhaust fans and increased traffic), and other effects. This new information, describing an environmental impact of great significance to residents in the Laurel Heights neighborhood, extends well beyond "simply clarif[ying], amplif[ying], or mak[ing] insignificant modifications to an adequate EIR." (*Marin Mun. Water Dist.* v. *KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1667 [1 Cal.Rptr.2d 767].) Indeed, the final EIR—unlike the draft EIR—describes an all-night operation located in the heart of a "predominant[ly]" residential neighborhood. For this reason alone, the final EIR should have been recirculated.

The draft EIR further states that, in addition to the facility's proposed occupancy of 1,530 persons, "[v]isitors associated with the proposed uses are projected to number about 340 people on an average daily basis." The draft EIR estimates that the facility would generate an estimated "106-142 daily truck trips," i.e., "an average of nine trucks an hour over an *eight hour delivery day.*" The draft EIR concludes that, "[i]ntensification of activity at [the] Laurel Heights [facility] would not disrupt . . . the existing physical community and would not constitute a major change to land use on site since the facility has been used with similar land use patterns for several decades." The draft EIR characterizes the intensification of land uses at the Laurel Heights facility and increases in traffic-related activity as "not significant," similarly characterizing the noise from exposed equipment, after mitigation measures are taken, as "not significant." The clear implication of these (and other) passages contained in the draft EIR is that the proposed facility would not involve a significant change in activity or noise from that already associated with the site.

In this respect, the final EIR stands in stark contrast to the draft EIR, the final document stating: "[T]he facility for the most part would operate

between 6 a.m. and *10 p.m.* However, *laboratories would likely operate on a 24-hour basis* on occasion when research activities so require . . . . [¶] In order to provide proper laboratory ventilation, *rooftop mechanical equipment would likely run 24 hours per day.*" (Italics added.) Implicit in statements contained in the final EIR is the circumstance that a certain number of laboratory workers, visitors, and delivery couriers would arrive and depart during that *24-hour* period. This dissimilarity between the draft EIR and the final EIR, in their respective descriptions of the facility's hours of activity, requires recirculation of the final EIR.[3]

The draft EIR, although lengthy, provides *no information* regarding the amount of noise that might be emitted from laboratory exhaust equipment (which the draft EIR describes as including 100 to 120 rooftop exhaust stacks, each one over 9 feet in height), *nor does it contain any measurements of nighttime noise levels in the adjacent residential areas.*[4] Notwithstanding these important factual omissions, the draft EIR concludes: "It is unlikely that the noise from building equipment would be greater than the existing ambient noise levels."[5] In response to public comment regarding noise levels, the final EIR acknowledges that "[e]quipment noise would be considered *significant* if the noise levels created by the equipment *exceeded 50 dBA . . .*" (italics added), and modifies the draft EIR's earlier conclusion to state as follows: "Noise from equipment installed on roofs or other exposed areas *could generate noise levels above the ambient noise level and the 50 dBA standard* [set forth] in the San Francisco Noise Ordinance." (Italics added.) The final EIR thereafter states that, with the aid of various mitigation measures, the local noise ordinance limit of 50 dBA "could be met." In view of the draft EIR's woeful inadequacy in addressing the noise-level issue, and the only slightly more substantive analysis contained in the final EIR, the revised document should have been recirculated for this reason

---

[3]Neither the draft EIR, nor the final EIR, specifically designates what portion of the Laurel Heights facility is to be occupied by laboratories. The draft EIR, however, suggests that the portion devoted to such use would be quite considerable, stating that, of the 80 percent of the facility proposed for biomedical research, "70 [percent] is generally devoted to laboratories, special equipment, and other support areas, and office space for researchers (minimal)."

[4]The draft EIR relied upon a measurement of noise levels during a single afternoon, between *3:40 p.m. and 5 p.m.*, then used this information to project the *24-hour average* noise level in the surrounding residential areas. One need not be an acoustical expert to question the value of such an average, in view of the neighboring residents' concerns having focused upon the proposed facility's contribution to *nighttime* noise.

[5]The Environmental Review Officer of the San Francisco Department of City Planning opined that the Regents' conclusion regarding the "insignificance" of nighttime noise *"has no visible means of support,"* adding that "[i]t would be a good idea to reanalyze nighttime noise resulting from typical laboratory exhaust equipment to compare it with actual nighttime noise measurements in the area, in order to inform the nearby residents of potential noise." (Italics added.)

alone. (See *Mountain Lion Coalition* v. *Fish & Game Com.* (1989) 214 Cal.App.3d 1043 [263 Cal.Rptr. 104] [where draft EIR inadequately addressed environmental consequences, circulation of a cumulative impact analysis for public comment was required].)[6]

The draft EIR states that the Laurel Heights facility "would cause only a slight increase over existing [traffic] volumes[, and] traffic-generated noise would not be significant." The draft EIR further asserts (rather strangely) that "increased [traffic] noise would be generated[, h]owever, the noise increase would not be audible."

The final EIR, while attempting to clarify the traffic-noise analysis, instead clouds the issue, the final document stating: "[P]roject-generated vehicle trips would not be sufficient to have a noticeable effect on average noise levels along local roadways. However, it is acknowledged that individual short-term noise events, particularly from trucks, could be annoying to noise sensitive receptors." By recasting vehicle noise as "short-term noise events" and concerned neighbors as "noise sensitive receptors," the final EIR engages in an assault upon its readers' linguistic sensibilities that parallels the project's potential assault upon its neighbors' auditory senses. The final EIR's inadequate and obfuscatory analysis, although tolerated by the majority, clearly fails to satisfy the requirement that, once comments are received from the public, " '[*t*]*here must be good faith, reasoned analysis in response.*' " (*Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 820 [176 Cal.Rptr. 342], quoting *Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285, italics by the *Sutter* court; see also *Mountain Lion Coalition* v. *Fish and Game Com.*, *supra*, 214 Cal.App.3d at p. 1051 [rejecting attempt "to circulate a document that simply swept the serious criticisms of the project under the rug"].)

Despite the draft EIR's acknowledgement that the Laurel Heights project will demand 722 parking spaces and accommodate only 516, leaving "206 vehicles unaccommodated," the final EIR blithely dismisses public concern regarding this issue: "Parking calculations concerning current and projected

---

[6]Despite the public concern over the conclusory nature of the draft EIR's noise analysis, the final EIR nevertheless adheres to certain highly questionable assumptions. For example, the final EIR states: "The mechanical noise could be detectable above the minimum background noise levels outdoors during the early morning hours, but would not be detectable indoors at any time." Bearing in mind that the proposed Laurel Heights facility would be located directly across the street from single- and multi-family residential dwellings, the final EIR's statement unreasonably assumes that neighbors never will open their windows.

parking demand are based on the project's estimated on-site population, not on parking survey results. *Parking occupancy near the site is thus not a factor in the analysis of project parking demand.*" (Italics added.) This response, too, does not appear to constitute "good faith, reasoned analysis," nor does it comply with this court's prior admonition to the Regents that "significant cumulative effects of a project must be considered . . . ." (*Laurel Heights I, supra,* 47 Cal.3d at p. 394.) Instead, the final EIR acknowledges that parking in the Laurel Heights neighborhood is "saturated," with a parking occupancy rate of "96-99%," but fails to address meaningfully the environmental impact (i.e., the traffic noise or other inconvenience to neighborhood residents) of up to 206 vehicles traveling through the neighborhood, perhaps late at night or in the early hours of the morning, on a daily basis, as their drivers search for a parking place.

The majority finds solace in the Regents' representations, contained in the final EIR, that they will adopt an array of procedures "to mitigate project noise to insignificant levels." (Maj. opn., *ante,* at p. 1136, fn. 25.) I do not believe we should be so sanguine. A facility comprised of laboratories operating throughout the night, in contrast to operation during normal business hours, necessarily will cause its employees and at least some of its "340 [daily] visitors" to arrive and depart at odd hours, adding to traffic noise at times when most residents in the neighborhood are likely to be asleep. The final EIR leaves unclear how, if at all, the Regents could reduce the increased nighttime traffic noise "to insignificant levels."[7]

The majority opinion holds that the additional data pertaining to noise "merely serve to *amplify*, at the public's request, the information found in the draft EIR." (Maj. opn., *ante,* at p. 1137, italics added.) Having compared the draft EIR and the final EIR, I am unpersuaded by the majority's holding; in my view, the latter document does more than "clarify" or "amplify" the former. Indeed, the final EIR includes precisely the type of " 'substantial changes' " that require recirculation. (See *Sutter Sensible Planning, Inc.* v. *Board of Supervisors, supra,* 122 Cal.App.3d at pp. 822-823, quoting *State of Alaska* v. *Carter* (D.Alaska 1978) 462 F.Supp. 1155, 1164.) Although the draft EIR appears to have suggested that the proposed Laurel Heights facility, similar to a typical commercial establishment, would operate primarily during *daytime* hours, the final EIR makes clear that significant

[7]In the present case, even if mitigation measures suggested by the Regents were to reduce project-related noise to 49 decibels, adjusted (dBA) (1 dBA below the limit allowable by local ordinance), I would not agree with the majority's conclusion that such noise, which the final EIR (unlike the draft EIR) indicates might occur on a 24-hour basis, would not constitute "significant new information" within the meaning of section 21092.1.

portions of the facility, such as laboratories and associated rooftop mechanical equipment, would operate on a *round-the-clock* basis. Under these circumstances, the Laurel Heights Improvement Association's request for recirculation of the final EIR was justified and should have been honored. In view of the "significant new information" (§ 21092.1) contained in the final EIR, I am unpersuaded by the Regents' argument that the request constituted an attempt to subvert CEQA rules into an instrument of "oppression and delay." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 576.)

Despite this "significant new information," the majority holds that "substantial evidence" supports the Regents' decision not to recirculate the final EIR. Having noted the draft EIR's inadequate analysis of project-related noise and other features of the proposed facility, I believe the majority's conclusion in this regard renders hollow and meaningless the term "substantial evidence." As I have discussed above, the draft EIR was not "sufficient as an informational document" (*Laurel Heights I, supra,* 47 Cal.3d at p. 407). Indeed, it was deficient in numerous respects, and the applicable legal standard, set forth in several decisions, prohibits project proponents from being permitted to "fill in" analytical gaps in a *final* EIR insulated from public comment. (See, e.g., *Mountain Lion Coalition* v. *Fish & Game Com., supra,* 214 Cal.App.3d at pp. 1050-1053; *Sutter Sensible Planning, Inc.* v. *Board of Supervisors, supra,* 122 Cal.App.3d at pp. 822-823.) In holding otherwise, the majority erroneously exalts the pro forma and misleading representations contained in the draft EIR over the substantive requirements of the law.

In view of the predominantly residential character of the neighborhood in question, I conclude that the final EIR's determination that the proposed Laurel Heights facility likely would operate on a 24-hour basis constitutes "significant new information" within the meaning of section 21092.1, requiring that the Regents recirculate the final EIR.

Accordingly, I would affirm the judgment of the Court of Appeal, reversing the trial court's order denying the Laurel Heights Improvement Association's petition for a writ of mandate, and remanding the matter to the trial

court with instructions to issue a writ of mandate directing the Regents to recirculate the final EIR for public comment.[8]

Appellant's petition for a rehearing was denied February 24, 1994, and the opinion was modified to read as printed above. George, J., was of the opinion that the petition should be granted.

---

[8]The parties agree that recirculation would have lengthened the review process by a matter of a few months. At oral argument, the Regents' counsel stated that "recirculation adds four to six months to the [CEQA review] process"; counsel for the Laurel Heights Improvement Association estimated that recirculation of the final EIR would add "two to three months." With these comments in mind, I observe that *the Regents' decision not to recirculate the final EIR*, despite that document's inclusion of "significant new information" within the meaning of section 21092.1, *has led to the addition of nearly four years* to the CEQA review process. Thus, despite the Regents' assertion that the Laurel Heights Improvement Association unreasonably has delayed the project, it appears to me that the Regents' disregard of both the applicable statutory provisions and this court's prior admonition to the Regents "to provide sufficient meaningful information" in the EIR (*Laurel Heights I, supra*, 47 Cal.3d at p. 399), constitutes a major cause of "this continuing controversy" understandably lamented by the majority. (Maj. opn., *ante*, at p. 1120.)