54 Cal.Rptr.3d 856 (2007)
147 Cal.App.4th 1091
SAVE TARA, Plaintiff and Appellant,
v.
CITY OF WEST HOLLYWOOD, Defendant and Respondent;
Waset, Inc., et al., Real Parties in Interest and Respondents.
No. B185656.
Court of Appeal of California, Second District, Division Eight.
February 21, 2007.
*858 Chatten-Brown & Carstens, Jan Chatten-Brown, Katherine A. Trisolini and Amy Minteer, Santa Monica, for Plaintiff and Appellant.
Jenkins & Hogin, Michael Jenkins, Manhattan Beach, and John C. Cotti, for Defendant and Respondent.
Latham & Watkins, James L. Arnone, Stephanie E. Ord and Benjamin J. Hanelin, Los Angeles, for Real Parties in Interest and Respondents. *857
*859 FLIER, J.
Respondent City of West Hollywood (City) and real parties in interest WASET, Inc., West Hollywood Community Housing Corporation (WHCHC) and Laurel Place West Hollywood, Inc., (sometimes collectively referred to hereafter as real parties in interest) entered into two agreements to develop property located at 1343 North Laurel Avenue in the City of West Hollywood. (This property, described more fully below, is referred to hereafter as Laurel Place.) The first was an option agreement entered into on June 9, 2003, and the second was an agreement to develop Laurel Place approved by City's council on May 3, 2004. Work on the environmental impact report (EIR) commenced in October 2004; during the pendency of these proceedings, the city council has given final approval to the EIR.
On July 12, 2004, appellant Save Tara, an unincorporated association of individuals that includes residents of Laurel Place, filed a petition for a writ of mandate seeking an order requiring City to set aside the agreements of June 9, 2003, and May 3, 2004. The petition also seeks a judicial declaration that these two agreements violate the California Environmental Quality Act (CEQA), various provisions of the Government Code and City's own ordinances.
The core of the matter is that no EIR was prepared prior to the agreement of May 3, 2004. The trial court concluded that an EIR was not required before this agreement was entered into, and denied the petition. We disagree and reverse with specific directions detailed in our opinion.

FACTS

1. Background
Laurel Place includes a colonial style home built in 1914-1915,[1] which was divided into four apartments in 1941-1942, and includes a "Chauffeur's House," which also became an apartment. City designated Laurel Place as a "Local Cultural Resource" in 1994. According to City's Cultural Heritage Advisory Board, Laurel Place reflects "special elements of the City's social, geographic, aesthetic and architectural history and possesses an integrity of location, design, feeling and association." "The house sits estate-like in the center of two large 80 foot lots" "behind a wide and heavily landscaped setback." According to a staff report prepared for the city council, Laurel Place is "Surrounded by densely built lots, the property setbacks and open space provide relief from more concentrated parcels. The low density property with heavy landscaping is an established and familiar visual feature along Laurel Avenue." The petition alleges, and the answer admits, that "in a City that describes itself as having a `severe' shortage of parks and green space, the [Laurel Place] property provides a unique green respite, shaded by trees that are nearly one hundred years old."
Laurel Place was owned by the Weisman family. Its last owner, Mrs. Elsie Weisman, then 98 years old, donated Laurel Place to City in 1997 by way of a quitclaim deed, on the conditions, among others, that she could live there until her death and that the tenants could live there for six months after her death. Mrs. Weisman died in 2000 at the age of 101, having lived in Laurel Place since 1924.

*860 2. The Option Agreement of June 9, 2003

On June 9, 2003, City entered into an "Option Agreement" with the real parties in interest WASET, Inc., and WHCHC. This agreement recited that City was the owner and seller of Laurel Place and that WASET, Inc., and WHCHC, the buyers, desired to acquire the exclusive right to purchase Laurel Place. The option agreement provided that the agreement was entered into to enable the buyers to obtain financing from the United States Department of Housing and Urban Development (HUD) under "the HUD Section 202 program to develop an approximately thirtyfive (35) unit housing complex for very low income senior households." The option agreement contained a provision for an extension of one year; in view of the recognized need for affordable housing for "very low income seniors," the price for Laurel Place was $393,375; and the closing of the escrow was made contingent on the buyers obtaining HUD financing.
In his presentation at the June 9, 2003 meeting of City's council where the option agreement was considered, City's housing manager explained the proposal to save the historic house, rehabilitate it, and provide 30 to 35 senior units to very low income seniors. The development was contingent on HUD grants for $3 million and would be done by an experienced development team that had worked with WHCHC in the past. City's housing manager stated: "This is also not the last bite at the apple.... This is only approving that we would be able to apply for federal funds. There would be several other actions that would be required before the project would be fully entitled and there will be public participation at every step."[2]

3. Application to and Approval by HUD
The application to HUD was filed on June 13, 2003; the application exceeds seven hundred pages. This application is of operative significance to our decision in this case, and we will refer to it as the "HUD application."
In the HUD application, real parties in interest WASET, Inc., and WHCHC represented that "[t]he City of West Hollywood has committed by vote, $2,500,000 to the development of LAUREL PLACE." (Boldface and underscoring omitted.) The HUD application and the supporting correspondence from City officials, politicians, and seniors leaves no doubt as to the plan to develop 35 affordable senior units on Laurel Place.[3]
The HUD application describes in great detail the proposed architectural layout and design of the project. The reconfiguration of the existing main building is described, e.g., the lower floor will be communal *861 space composed of a kitchen, arts and crafts room, television lounge, etc. The new building is described as "ushaped and [will] wrap around the rear and both sides of the existing house." Other details, such as the primary entrance and allocation of administrative space, are also provided. The central courtyard area is to contain, among other things, a gazebo with shade trellis and "lush landscaping." Specific components of the new building, such as the arts and crafts room and public rest rooms, are also described. The 35 dwelling units are to be configured to allow for the "most efficient delivery of services and to encourage social interaction while emphasizing the non-institutional aspect of the building." Details of the dwelling units are also provided, e.g., the width of the doorways (36") to accommodate wheelchairs and the wall cabinets with pulls that can be used by persons with arthritis. A professionally prepared, architect's rendition of floor plans, as well as the layout of the entire project, are attached to the descriptive text.
The HUD application also sets forth the "parcel's environmental problems" including lead and asbestos in the building, possible soil contamination from an incinerator, and a remediation plan that the City agreed to fund at an estimated $560,000. The HUD application also contains an "Historic Structures Report."
HUD awarded a $4.2 million grant for the development of Laurel Place in November 2003.

4. The Period Immediately Preceding the May 3,2004 Council Meeting
On April 23, 2004, City announced, among other places, on its website that on May 3, 2004, the council `'will consider the development of a 35-unit affordable Senior housing project and park." The announcement stated that the council would consider: (1) approving a one-year extension of the option agreement; (2) approving "an agreement to facilitate development of the project, including a $475,000 predevelopment loan, subject to environmental review and additional review by the Historic Preservation, Planning and Public Facilities Commission;" and (3) reviewing and advising staff on "alternative configurations for the proposed 35-unit Senior Housing Project to be built behind the historic Weisman House which will be preserved and restored."
On April 29, 2004, counsel for appellant Save Tara[4] wrote to the members of the city council objecting to the planned actions both as "inconsistent with the intent of Elsie Weisman"[5] and because the City must comply with CEQA, including an EIR, "before renewing the option agreement and entering into a development agreement for the property." Counsel urged the City not to renew the option agreement or approve the agreement to facilitate development but instead "consider a public use that will respect the nature of this historic property."
The staff report on this agenda item stated that the city council would consider approving "a Conditional Agreement for Conveyance and Development of Property *862 that will lead to development on [Laurel Place] of 35 units of affordable senior housing" as well as rehabilitation of the main house and retention of landscaped open space as a public "pocket park." The report recommended: approval of the agreement "to facilitate development of the project" and begin the process of exploring relocation, options with the tenants; to authorize the city manager to execute the documents substantially in the form attached to the report;[6] to review alternative configurations for new construction, and refer them to various City commissions for review; and to direct staff to hold a preliminary informational meeting to obtain further input from the neighborhood. The staff report stated that the "the project attempts to strike a balance among the various goals and objectives." Under "fiscal impact," the staff report concluded that the recommended actions would "[c]ommit the City to convey the property to Laurel Place West Hollywood" in exchange for the commitment to develop the affordable senior project as planned; would commit $475,000 in predevelopment funds; and would commit the balance of $1 million as a construction loan, "subject to project approval and funding by HUD."

5. The May 3, 2004 Council Meeting; CEQA and EIR Are Mentioned
Public speakers both for and against the City's plans crowded the May 3,2004 hearing. Many citizens signed petitions or letters to the council opposing any development on the site. The dichotomy was principally between those who wanted more affordable housing for seniors, along with preserving the house and much of the grounds as had been proposed in the HUD grant, and those who supported affordable housing at some other location but, fearing the destruction of trees and parts of the house, wanted Laurel Place to be restored and preserved, and used by City in a manner that would maintain both the green space and the house.
Although the minutes of the meeting repeatedly referred to the "proposed project," the city attorney in his oral presentation stated "that the recommendation of this item is not approval of a project, but rather a concept," that the expenditure of funds did not commit City to any specific project design and that an EIR was not required until the project "is solidified." The city attorney considered the agreement truly conditional on the performance of a number of prerequisites, the failure of any of which would mean the concept would not go further. He explained that "it is not a commitment to any particular project. No mitigation measures have been precluded. There was no loss of flexibility." The city attorney characterized the approval as "allowing for funds to be advanced in order to prepare studies, to prepare architectural renderings, to conduct historical preservation analysis and to do other studies, the absence of which really make it really impossible to go forward at all." He believed that "genuine flexibility remains" to address the environmental concerns, so there need not be an EIR yet. One council member stated that "this project" first came before the council "as a concept" about a year before.
The representative from WHCHC stated that "any actual design proposal will be subject in the coming months to an environmental impact review, a review by the community, by the Historic Preservation Commission, by the Planning Commission and ultimately by this council." The architect *863 discussed plans for preserving the house and acreage and the difference in plans for a two-story or three-storing building in back of the house and choices for use of the house itself, but emphasized that the building had not as yet been designed.
The oral presentation made by City, before the public spoke, initially described the agenda item as "a conditional agreement for conveyance and development of property at 1343 Laurel Avenue to serve multiple goals of affordable housing, historic preservation and park development. It also offers council an opportunity to comment on alternative concepts and to start the public participation process to select and refine a design." Referring to the need for low-income senior housing, City's housing manager stated: "This project will provide overit will provide 35 affordable senior units that will be available [for] rents at approximately $200 per month." He described the HUD grant and stated it "specified 35 units, the retention and the rehabilitation of the historic house and the park so it's all part ofit was all part of the proposal, it's a part of HUD's expectations." He added: "The project will be subject to a full EIR and public review. And the EIR will start upon submission of a development permit application to the planning division and we're still months away from that." Moreover, City "would convey the property conditioned on the developer obtaining all the environmental clearances required for project entitlement.
City's housing manager explained that the HUD grant is on a "very firm deadline" and that construction had to begin by November 2005, two years after the award of the grant. Therefore, an application for planning review needed to be submitted and the City had to "take action on this project by the end of the year." "Construction, we think, will start sometime between July and November of '05 and be completed by the end of '07."
The City's housing manager added that "this is not a rubber stamp. There are real options to consider here.... And there will be additional opportunities as the EIR is circulated for public input." He stressed "that the agreement before you is a conditional agreement." The housing manager went on to state that "by taking the recommended action tonight, the council is affirming its commitment to a project that balances multiple objectives and anything short of that would not meet the contractual requirements. But while the agreement is conditional, the council needs to know that the recommended actions will commit the city as long as the developer delivers. And we also can't put this off. The clock is ticking. We've already used up six months of our two year time frame to get under construction."
The city council approved the agreement between City and real parties in interest on May 3, 2004, and also extended the Option Agreement for one year.

6. The Terms of the May 3, 2004 Agreement
The May 3, 2004 agreement (hereafter the May 2004 Agreement) is between City and real party in interest Laurel Place West Hollywood, Inc., the latter being referred to in the agreement as "Developer."
The May 2004 Agreement is a complex document extending to 39 pages of single-spaced text and eight attachments. It is entitled "Conditional Agreement for Conveyance and Development of Property." Without attempting to summarize the entire document, we note some of the aspects of this agreement that are material to the proceedings before us.
*864 The stated purpose of the agreement is to develop Laurel Plaee for the purpose of providing affordable housing for seniors and a neighborhood "pocket park." Thirty-four of the unite are to be restricted to very-low and low income senior households; one unit is for the resident manager. The main house is to be rehabilitated. The performance of the various phases of the development is regulated in detail, as are the various issues and questions arising from the transfer of the title to Laurel Place. The terms of the escrow are set forth in minute detail. It is very significant that the agreement leaves no room for doubt about the scope and nature of the development. "Barrier free design approach shall govern the layout of each apartment" with each unit to be composed of a full bath, a living room/dining room combination and a kitchen. The design of the units and the style to be followed in the interiors is carefully delineated, down to such detail as natural light to be provided by large sliding glass doors; semi-subterranean parking to be placed at the rear setback yard; the majority of the mature trees are to be retained and landscaping is to employ "a variety of plant materials that include diverse colors and textures."
The scope and detail of this agreement, of which we have given only illustrations, is of two-fold significance. First, the agreement presents a project for which the planning in practical fact is complete. As we explain below, however, an EIR is to be part of the planning process, and is not an after-the-fact rationalization of a completed plan. Second, the agreement is, first and last, an agreement to develop Laurel Place; it is not a "land acquisition agreement," as City contends. We return to these points in parts 1 and 2 of the Discussion portion of this opinion.

7. Filing of the Petition for a Writ of Mandate: June 2, 2004
We defer a discussion of appellant's petition for a writ of mandate to the next principal part of this opinion entitled "Procedural History." Since there were a number of events that took place after June 2, 2004, we proceed to summarize them.

8. The Revised Agreement of August 9, 2004
In July 2004, City and real party in interest Laurel Place of West Hollywood, Inc., entered into an agreement that revised the May 2004 Agreement. The parties refer to this revised agreement as the August 9, 2004 Agreement, and we adopt the same terminology.
The August 2004 Agreement is substantially the same as the May 2004 Agreement. However, one of the differences between the two agreements is that under the August 2004 Agreement CEQA requirements must be complied with and cannot be waived. The May 2004 Agreement provided that the city manager could waive a number of conditions precedent, including CEQA requirements; appellant's petition for a writ of mandate challenged this provision of the May 2004 Agreement.

9. Preparation of the EIR
Work on the EIR commenced in October 2004.[7] On August 3, 2006, City's planning commission certified a final EIR and a statement of "overriding considerations." The city council has now approved the EIR.

*865 PROCEDURAL HISTORY

I. The Petition for a Writ of Mandate
The operative amended petition was filed on July 12, 2004, and alleged five causes of action. The first cause of action alleges that CEQA required City to conduct an environmental impact review prior to making a decision on the project involving Laurel Place. This cause of action alleges that City did not meet this obligation in that it did not prepare an EIR prior to entering into the May 2004 Agreement. The second cause of action alleges that City violated Government Code sections 65867 and 65867.5, which provide that a development agreement cannot be entered into unless certain procedures are followed, among which are a public hearing and the enactment of an ordinance approving the development agreement. The third cause of action alleges violations of certain provisions of City's own municipal code that mirror the Government Code sections set forth in the second cause of action. The fourth cause of action alleges that the project set forth in the May 2004 Agreement is inconsistent with City's general plan. The fifth cause of action seeks a judicial declaration that the CEQA and the aforesaid provisions of the Government Code and City's municipal code were violated.
The petition sought the following relief:
(1) A mandate ordering City to set aside the May 2004 Agreement[8] and the Option Agreement;
(2) An injunction prohibiting City from proceeding with any actions under the May 2004 Agreement and the extension of the Option Agreement "pending full compliance with the Government Code, the West Hollywood Municipal Code and CEQA";
(3) An injunction prohibiting City and real parties interest from cutting down any trees or removing any structures "prior to [the] resolution of this case";
(4) For a judicial declaration that City's "approval" of the May 2004 Agreement and of the extension of the Option Agreement "violates CEQA, the Government Code, and West Hollywood's zoning ordinance and is therefore void."

2. Discovery Disputes
We note that a number of discovery disputes developed after July 2004. To a large extent, these disputes revolved around documents generated after May 3, 2004, when the May 2004 Agreement was concluded. These documents, with the exception of the August 2004 Agreement (see text, post), are not germane to our decision and we therefore express no opinion on the resolution of these discovery disputes.
The trial court granted real parties in interests' and City's motion to augment the record with the August 2004 Agreement.

3. The Trial Court's Decision
The trial court first concluded that CEQA was not violated. The court reasoned that City "has not yet entered into a legally binding agreement to approve the conveyance ... of the Tara property or the proposed housing project. The [May 2004] Agreement is expressly conditioned on compliance with CEQA.... The City has not given its final approval to convey the property ... nor has it given its final approval of the housing project itself."
Next, the court concluded that the Government Code was not violated because City had not in fact entered into a binding *866 development agreement. For the same reason, the court found that there was no merit to the third cause of action that alleges violations of City's municipal code.
Finally, the court concluded that since City had not approved the "Design Documents" called for by the May 2004 Agreement, it calls for speculation whether the project was in fact inconsistent with City's general plan.
The court entered judgment denying the petition in accordance with these rulings.

DISCUSSION

1. The Trial Court Did Not Err in Admitting into Evidence the August 2004 Agreement
Appellant contends that the trial court erred in admitting into evidence the August 2004 Agreement because this agreement is not documentation of the final public agency decision, as that term is set forth in Public Resources Code section 21167.6, subdivision (e)(9).[9]
We do not agree. First, the list of materials set forth in subdivision (e) of section 21167.6 of the Public Resources Code is not intended to be exhaustive. Second, the fact is that the operative agreement that City approved is the August 2004 Agreement. While the May 2004 Agreement is relevant for certain purposes, review of City's decision would be ineffective, if it were limited to the May 2004 Agreement, which is no longer operative. Thus, the petition should be treated as amended to address the August 2004 Agreement, in so far as appellant seeks to set aside action taken by City.

2. City Has Not Complied with Public Resources Code Section 21100
In "relevant part, Public Resources Code section 21100, subdivision (a) provides: "All lead agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment." (Italics, added.)
The operative fact that triggers Public Resources Code section 21100, subdivision (a) (hereafter section 21100) is not a "final" approval or a "final" agreement, or even an "approval" or an "agreement" to develop a project. In the terms of section 21100, the operative facts are that there must be a "project which they [all lead agencies] propose to carry out or approve." Broken down into two elements, there must be a(l) project that the agency (2) proposes to carry out or approve.
"A statute should always be so construed, if reasonably possible, as to give force and effect to every expression used by the legislature." (County of Los Angeles v. Frisbie (1942) 19 Cal.2d 634, 641-642, 122 P.2d 526.) "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." (Arnett v. Dal Cielo (1996) 14 Cal.4th 4, 22, 56 Cal. *867 Rptr.2d 706, 923 P.2d 1.) "Excepting when clearly otherwise intended or indicated, words in a statute should be given their ordinary meaning and receive a sensible construction in accord with the commonly understood meaning thereof." (County of Los Angeles v. Frisbie, supra, at p. 642, 122 P.2d 526.)
The words "propose to" in section 21100 are not to be ignored. The ordinary meaning of "propose to carry out or approve" is that the project is contemplated or envisioned, not that the project has received approval. If the Legislature intended to limit EIR's to projects that have received approval by the agency, it would have been an easy matter to set that forth in section 21100.
Our textual analysis of section 21100 is confirmed by the decisions of our Supreme Court. "The EIR has been aptly described as the `heart of CEQA.' [Citations.] Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made." (Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 564, 276 Cal.Rptr. 410, 801 P.2d 1161, fn. omitted, cited in Laurel Heights Improvement Assn. v. Regents of University of California (1993) 6 Cal.4th 1112, 1123, 26 Cal.Rptr.2d 231, 864 P.2d 502.) "`CEQA requires that an agency determine whether a project may have a significant environmental impact, and thus whether an EIR is required, before it approves that project.' (No Oil, [Inc. v. City of Los Angeles (1974)] 13 Cal.3d 68, 79[, 118 Cal.Rptr. 34, 529 P.2d 66], italics by court; [citation].) This requirement is obvious in several sections of CEQA. For example, [Public Resources Code] section 21081 refers to approval of a project for which an EIR `has been completed,' and [Public Resources Code] section 21151 requires an EIR for a project an agency `intend[s] to carry out or approve.' (Italics added.) The Guidelines[10] provide even more explicitly that `Before granting any approval of a project subject to CEQA, every lead agency ... shall consider a final EIR....' (Guidelines, § 15004[,] subd. (a), italics added.) A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding whether to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved. If postapproval environmental review were allowed, EIR's would likely become nothing more than post hoc rationalizations to support action already taken. We have expressly condemned this use of EIR's. (No Oil, supra, 13 Cal.3d at p. 79[, 118 Cal.Rptr. 34, 529 P.2d 66].) The Regents' view that their approval of a project is the predicate for an EIR stands this principle on its head." (Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 394, 253 Cal.Rptr. 426, 764 P.2d 278.)
As one appellate court has explained the rule, the informational purpose of CEQA is crucial to informed decision-making. While CEQA does not guarantee that these decisions will always be those which favor environmental considerations, "CEQA does, however, guarantee or at least attempt to assure that the environmental consequences of a government decision on whether to approve a project will be considered before, not after, that decision is made." (Stanislaus Natural Heritage Project v. County of Stanislaus (1996) 48 Cal.App.4th 182, 196, 55 Cal.Rptr.2d 625.)
*868 The role and significance of public comment in the EIR review process is intended to be meaningful and substantive. "In the course of preparing a final EIR, the lead agency must evaluate and respond to comments relating to significant environmental issues. (§ 21092.5, subd. (a); [CEQA] Guidelines, §§ 15088, 15132, subds. (b-d).) In particular, the lead agency must explain in detail its reasons for rejecting suggestions and proceeding with the project despite its environmental effects. (Guidelines, § 15088, subd. (b).) `There must be good faith, reasoned analysis in response [to the comments received]. Conclusory statements unsupported by factual information will not suffice.' (Ibid.)" (Laurel Heights Improvement Assn. v. Regents of University of California, supra, 6 Cal.4th 1112, 1124, 26 Cal. Rptr.2d 231, 864: P.2d 502.) Since public participation is an essential part of the CEQA process (id at p. 1123, 26 Cal. Rptr.2d 231, 864 P.2d 502), and since public participation must be a meaningful part of the process, it is wrong to defer an EIR until after a decision has been made.
For this reason, we conclude that the trial court erred when it concluded that no EIR was required because City "has not yet entered into a legally binding agreement to approve the conveyance ... of the Tara property or the proposed housing project. The [May 2004] Agreement is expressly conditioned on compliance with CEQA.... The City has not given its final approval to convey the property ... nor has it given its final approval of the housing project itself."
The trial court's error is two-fold. First, an EIR is not to be delayed until a "final" decision has been made. Second, the finding that the agreement was "expressly conditioned on compliance with CEQA" indicates a misunderstanding of the EIR review process. That process is intended to be part of the decision-making process itself, and not an examination, after the decision has been made, of the possible environmental consequences of the decision.[11]
There may be a concern about the inexact nature of the phrase in section 21100 that an EIR must be prepared for "any project which [lead agencies] propose to carry out or approve." The answer to this concern has been provided by the Supreme Court. "Obviously it is desirable that the precise information concerning environmental consequences which an EIR affords be furnished and considered at the earliest possible stage. The Guidelines express this principle in a variety of ways. Thus, `EIR's should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design.' (Cal.Admin.Code, tit.14, § 15013.)" (Bozung *869 v. Local Agency Formation Com. (1975) 13 Cal.3d 263, 282, 118 Cal.Rptr. 249, 529 P.2d 1017, italics added.) Thus, the question is whether there is enough information about the project to "provide meaningful information for environmental assessment" (Guidelines, § 15004, subd. (b)). Any ambiguity in the phrase "any project which [lead agencies] propose to carry out or approve" is resolved by the pragmatic inquiry whether there is enough information about the project to permit a meaningful environmental assessment. If the answer is yes, the EIR review process must be initiated.
The record before us supports the conclusion that, as of the time that the HUD application was submitted in June 2003, there was enough information about the project to "provide meaningful information for environmental assessment," in the terms of Guidelines section 15004, subdivision (b). In light of the pivotal role of HUD financing, it made sense, of course, to wait for HUD's decision before initiating the EIR review process. However, once HUD approved the $4.2 million grant for the project in November 2003, the EIR review process should have been initiated.
In sum, for the reasons set forth we conclude that City failed to comply with section 21100 by: (1) deferring the EIR review process until after the May and August 2004 Agreements and by (2) engaging in the EIR review process after the decision taken on May 3, 2004, to enter into the May 2004 Agreement.

3. City's Contentions Are Without Merit
We were informed of the ongoing EIR while this appeal was pending. After oral argument, we vacated submission of this case and requested the parties' views on the materiality of the EIR to this appeal, including the question whether the EIR, once completed, would render this appeal only of academic interest. We do not find City's views to be persuasive.
First, we cannot agree with City that the EIR, once completed, will render this appeal moot. The EIR process did not operate in this case as it should have. The fact of the matter is that the public was denied the right to participate in the decision-making process until all the operative decisions had in fact been made. It is also true that if an agency, having effectively approved a project, could defer an EIR until after the approval, and then successfully contend that the belated EIR rendered the matter moot, CEQA would be rendered a dead letter. At best it would, as the Supreme Court has put it, become nothing more than a post hoc rationalization to support action already taken. (Laurel Heights Improvement Assn. v. Regents of University of California, supra, 47 Cal.3d 376, 394, 253 Cal.Rptr. 426, 764 P.2d 278.)
Second, we reject City's contention that "[n]o purpose" would have been served to have prepared an EIR "to evaluate a conceptual and uncertain proposal." An EIR is to be part of the decision-making process itself, and therefore some uncertainties have to be accepted as part of that process. Moreover, we cannot agree that there was much, if anything, "conceptual and uncertain" about the project after the HUD application was filed in June 2003. Indeed, the record attests to the fact that all throughout the proceedings, even as early as the Option Agreement, there was a great deal of clarity about the character, scope and even the details of the project.[12]
*870 Third, City contends that the May and August 2004 Agreements were merely "land acquisition agreements" in the sense of Guideline section 15004, subdivision (b)(2)(A). This provision states that an agency may enter into a "land acquisition agreement" without entering into an environmental impact review process, provided that the future use of the land has been conditioned on compliance with CEQA. This contention must be rejected as fundamentally unrealistic. For one, City acquired Laurel Place in 1997 from Mrs. Elsie Weisman, and not as a result of the May and August; 2004 Agreements. Even more important is the palpable fact that these agreements set forth how Laurel Place is to be developed; these agreements have nothing to do with City's acquisition of Laurel Place.

4. The May and August 2004 Agreements Are Not Development Agreements
The May and August 2004 Agreements do not satisfy the statutorily defined elements of a development agreement, which are set forth in Government Code section 65865.2.[13] The purpose of the statutes that created "development agreements" under the Government Code is to give builders the right to acquire by contract the equivalent of a vested right at an early stage of the project. (Citizens for Responsible Government v. City of Albany, supra, 56 Cal.App.4th 1199, 1213, 66 Cal.Rptr.2d 102.) A development agreement confers a special status on the development, which, as noted below, is an exemption from local zoning regulations.
Neither the May nor the August 2004 Agreement was intended to be a development agreement. One of the important attributes of a development agreement is that the development agreement is enforceable regardless of any subsequent change in the general plan, any specific plan, zoning or subdivision regulation of the local governing body that would otherwise alter the rules, regulations or policies in effect when the development agreement is finalized. (Govt.Code, § 65865.4; see generally 9 Miller & Starr, Cal. Real Estate (3d. ed.2001) § 25:228, pp. 723-727.) Under paragraph 165.0 of the May 2004 Agreement, the Developer undertakes to conform to all zoning and "General Plan" requirements. Such a provision does not square with the purposes of a development agreement. Nor does either the May or the August 2004 Agreement provide for a term of the agreement, which is the first criterion of a development agreement listed in Government Code section 65865.2. This is not a minor matter, since the special status conferred by a development agreement on the developer cannot last definitely.
Appellant does not question the balance of the trial court's rulings. Accordingly, *871 we affirm those rulings without further discussion.

5. The Remedial Actions To Be Mandated by the Trial Court
Public Resources Code section 21168.9 sets forth the relief that may be granted when the court has determined that an agency has not complied with the provisions of CEQA.
Public Resources Code section 21168.9, subdivision (a)(1) provides that a mandate may issue "that the determination, finding, or decision be voided by the public agency, in whole or in part." This section empowers the trial court to issue a writ of mandate directing City to declare void its approval of the May 2004 Agreement.
This order, standing alone, will not bring City into compliance with CEQA. The fact is that the EIR review process should have been in progress during the period between November 2003 and May 2004.
Public Resources Code section 21168.9, subdivision (a)(3) empowers the court to issue a mandate "that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division." Accordingly, a mandate must issue that directs City to engage in the EIR review process: (1) based on the project as described in the HUD application; and (2) without reference to the May and August 2004 Agreements.

DISPOSITION
The judgment is affirmed insofar it finds that the petition does not state facts sufficient to entitle appellant to relief on the second, third and fourth causes of action, and to the extent that the fifth cause of action seeks a judicial declaration that Government Code sections 65867 and 65867.5 and City's municipal code were violated. In all other respects, the judgment is reversed and the case is remanded to the superior court with directions:
(1) To issue a writ of mandate directing City to declare void its approval of the May and August 2004 Agreements; and
(2) To mandate that City engage in the EIR review process (a) based on the project as described in the HUD application and (b) without reference to the May and August 2004 Agreements.
Pursuant to Public Resources Code section 21168.9, subdivision (b), the trial court shall retain jurisdiction over this action in order to:
(1) Specify promptly, after notice and hearing, a date by which City must certify a new EIR in accordance with CEQA standards and procedures, including provisions for public comment, and to make any findings that may be required by CEQA; and
(2) Ensure that City engages in the EIR review process based on the project as described in the HUD application and without reference to the May and August 2004 Agreements.
Petitioners are to recover their costs in these proceedings.
RUBIN, J., concurs.
COOPER, P.J., Dissenting.
I respectfully dissent because I believe that in view of subsequent events the matter is moot and the appeal should be dismissed. Appellant sought to revoke the approval by respondent City of West Hollywood (City) of the conditional sale agreement involving the subject public property, absent compliance with the California Environmental Quality Act (CEQA). I share the majority's concern that there not be "post hac rationalizations" to support prior approval of proposed projects, a caveat expressed in Laurel Heights Improvement *872 Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 395, 253 Cal. Rptr. 426, 764 P.2d 278. (Accord El Morro Community Assn. v. California Dept. of Parks and Recreation (2004) 122 Cal. App.4th 1341, 1361, 19 Cal.Rptr.3d 445.) Even if an environmental impact report (EIR) might well have been beneficial before the City negotiated to loan the developers money and give them property that would be used for the low income senior housing, I believe that appellant has now received virtually what it was seeking in the petition; remanding for a new CEQA procedure when one has just been completed, a decision from which appellant has not appealed, does not seem the appropriate remedy to mi.
Furthermore, and importantly there was almost contemporaneous compliance in that CEQA procedures were initiated shortly after the City's contested actions and concurrently with this litigation. I recognize that failure to obey provisions that go to the heart of CEQA protective measures is generally prejudicial. (Sierra Club v. State Ed. of Forestry (1994) 7 Cal.4th 1215, 1236, 32 Cal.Rptr.2d 19, 876 P.2d 505 ["Only if the manner in which an agency failed to follow the law is shown to be prejudicial, or is presumptively prejudicial, as when the department or the board fails to comply with mandatory procedures, must the decision be set aside, however. (Environmental Protection Information Center, Inc. v. Johnson [(1985)] 170 Cal.App.3d 604, 622[, 216 Cal.Rptr. 502]."].) Accord California Oak Foundation v. City of Santa Clarita (2005) 133 Cal.App.4th 1219, 1226, 35 Cal.Rptr.3d 434.) However, in my view, the particular procedural facts of this case make remand unnecessary even assuming initial lack of compliance with CEQA.
The parties have informed us that a final environmental impact report (FEIR) was certified on October 16, 2006, regarding the Laurel Place Senior Housing Project and that no judicial challenges were timely filed against the FEIR. (Pub. Resources Code, §§ 21167.2, 21167, subd. (c).) The project for which the notice of determination was filed is described as follows:
"The purpose of the proposed project is to increase affordable senior housing in the City, while preserving a local cultural resource and increasing parkland. The proposed project involves three separate elements: renovation and rehabilitation of the existing main house and chauffeur's cottage, construction of new housing behind the main house, and creation of a public park in the northern and eastern portion of the site. The two-store main house, which currently includes four residential units, would be reconfigured to include five one-bedroom senior apartments, one two-bedroom resident manager's office, and common space in the front ground-floor rooms that would be open to the public. The existing chauffeur's cottage located on the northwest corner of the site would be retained and rehabilitated for use as a single residential unit. The existing garages and bachelor's apartment, located near the rear of the site, would be removed. A new building of two to three stories in height would be constructed in the southwest portion of the site behind the main house and south of the chauffeur's cottage. The building would contain 21 one-bedroom senior apartments and a 17- to 19-car subterranean garage. A public park of approximately 9,900 square feet would be created on the northern and eastern portion of the site." With certain modifications, the senior housing is very similar to that proposed to be funded in 2004.
The procedures sought by appellant have been effected. The project for which funding was sought has been subject to *873 CEQA scrutiny. The specific issue is not likely to recur between these parties. (Compare with National Parks & Conservation Assn. v. County of Riverside (1996) 42 Cal.App.4th 1505, 1514, 50 Cal.Rptr.2d 339 [`Issues are not only likely to recur, but are actually still in controversy between the same parties"].) Appellant has not demonstrated that the matter is one "of continuing public interest" and an issue "likely to recur," another reason for exercising appellate discretion to resolve a moot issue. (Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 747, 29 Cal. Rptr.2d 804, 872 P.2d 143, citing Downtown Palo Alto Com. for Fair Assessment v. City Council (1986) 180 Cal.App.3d 384, 391, 225 Cal.Rptr. 559, "[deciding moot issue of validity of Palo Alto city ordinance because of testimony that 50 other California cities had adopted similar ordinances].") Nor are these issues that occur "at a level of `low visibility' in a short period of time [or involve] asserted errors which are not ordinarily reviewable on appeal." {In re William M. (1970) 3 Cal.3d 16, 24.-25, 89 Cal.Rptr. 33, 473 P.2d 737; Californians for Alternatives to Toxics v. Department of Pesticide Regulation (2006) 136 Cal.App.4th 1049, 1069, 39 Cal.Rptr.3d 393 ["raises important issues of public policy that are likely to recur, yet will evade review because of the cyclical nature of the renewal process"].)
This is not a case where, once CEQA procedures began, appellant points to errors in the omission of information or has challenged the FEIR determination. Rather, appellant argued in the superior court that the City must initiate CEQA procedures, especially an EIR. I would not reverse and remand when the City very quickly undertook to comply with CEQA, with procedures initiated within months of the May approval and July amended approval. "`[A]n action which originally was based upon a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events. A reversal in such a case would be without practical effect, and the appeal will therefore be dismissed.'" (Environmental Coalition of Orange County, Inc. v. Local Agency Formation Com. (1980) 110 Cal.App.3d 164, 170, 167 Cal.Rptr. 735.) To require the parties to begin again when the substance of the requested acts began quickly and has now been accomplished seems to me to be without purpose. "The law neither does nor requires idle acts." (Civ.Code, § 3532.) I therefore would dismiss the appeal as moot.
NOTES
[1] There is a conflict in the evidence when the main house was built. The petition alleges the dates set forth in the text. Documents generated by City state the house was built in 1923. It appears the main house has 7,044 square feet.
[2] At the same time that City entered into the option agreement, City's council also approved $20,000 in recoverable financing to be used to help WHCHC to "develop a proposed low-income senior project to be located at 1343 North Laurel Avenue." In an agreement signed July 18, 2003, City acknowledged that WHCHC might not be able to obtain financing, in which case repayment of the recoverable grant would not be necessary.
[3] For example, a letter from City's mayor to HUD stated in part City's "strong support" of the application `to fund development of 35 units of affordable housing for the elderly." A letter from the city manager indicated City's "financial commitment to the Section 202 proposal by [WHCHC] and WASET to develop 35 affordable senior units at 1343 Laurel Avenue in West Hollywood," explaining that the City will be contributing land and funds totaling $2.5 million "toward the development of the Laurel Place project." (Boldface omitted.) The City's planning manager opined that the entire parcel "upon which the above described 35-unit low-income housing project is to be located" conforms to zoning and will not require a conditional use permit.
[4] Use of the name Tara is explained by the fact that Mrs. Weisman's favorite movie was Gone With the Wind, which she was watching when she passed away. There is a passing similarity between the main house on Laurel Place and the Tara of Gone With the Wind fame.
[5] The petition alleges, and the answer in substance denies, that Mrs. Weisman "believed that the City, which had designated [Laurel Place] as a cultural resource, would protect it as a public resource with little or no alteration to the buildings or landscaping."
[6] A 42-page conditional agreement for conveyance and development of property was attached.
[7] Without burdening this opinion with the details, we base this on materials that are attached to a request for judicial notice filed by real parties in interest in the trial court on October 22, 2004.
[8] The petition predates the revision of this agreement by the August 2004 Agreement.
[9] Public Resources Code section 21167.6 provides that the record of proceedings includes, but is not limited to, the materials enumerated, including those in subdivision (e)(9): "The documentation of the final public agency decision, including the final environmental impact report, mitigated negative declaration, or negative declaration, and all documents, in addition to those referenced in paragraph (3), cited or relied on in the findings or in a statement of overriding considerations adopted pursuant to this division." Subdivision (e)(3) states: "All staff reports and related documents prepared by the respondent public agency and written testimony or documents submitted by any person relevant to any findings or statement of overriding considerations adopted by the respondent agency pursuant to this division."
[10] The CEQA Guidelines are to be found in California Code of Regulations, title 14, section 15000 et seq.
[11] As one Court of Appeal has lucidly explained it: "[T]he appropriate time to introduce environmental considerations into the decision making process was during the negotiation of the development agreement. Decisions reflecting environmental considerations could most easily be made when other basic decisions were being made, that is, during the early stage of `project conceptualization, design and planning.' Since the development site and the general dimensions of the project were known from the start, there was no problem in providing `meaningful information for environmental assessment.' At this early stage, environmental review would be an integral part of the decision-making process. Any later environmental review might call for a burdensome reconsideration of decisions already made and would risk becoming the sort of 'post hoc rationalization[] to support action already taken,' which our high court disapproved in Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 394[, 253 Cal.Rptr. 426, 764 P.2d 278]." (Citizens for Responsible Government v. City of Albany (1997) 56 Cal. App.4th 1199, 1221, 66 Cal.Rptr.2d 102.)
[12] The Option Agreement was practically contemporaneous with the HUD application, which provided a very detailed and concrete description of the project.
[13] Government Code section 65865.2 provides: "A development agreement shall specify the duration of the agreement, the permitted uses of the property, the density or intensity of use, the maximum height and size of proposed buildings, and provisions for reservation or dedication of land for public purposes. The development agreement may include conditions, terms, restrictions, and requirements for subsequent discretionary actions, provided that such conditions, terms, restrictions, and requirements for subsequent discretionary actions shall not prevent development of the land for the uses and to the density or intensity of development set forth in the agreement. The agreement may provide that construction shall be commenced within a specified time and that the project or any phase thereof be completed within a specified time."